SANDERSON v. BISHOP et al.

(Circuit Court, W. D. Arkansas, Texarkana Division. January 7, 1909.)

1. VENDOR AND PURCHASER ⊜18(½)—NEGOTIATIONS AFTER EXPIRATION OF OPTION HELD NOT TO CREATE CONTRACT.

   Where a written option to purchase land had expired without renewal, further negotiations between the parties on the basis of the option contract, and acts which were conditional on completion of the sale, *held* not to create a contract enforceable in equity by the vendor.

2. SPECIFIC PERFORMANCE ⊜17—CONTRACT HELD NOT ENFORCEABLE BY THIRD PERSON.

   A contract made by a third person with one holding an option to purchase land, by which he agreed to join in the purchase and pay a stated sum for a half interest in the land, *held* not enforceable in equity by the vendor.

In Equity. Suit by H. G. Sanderson against George W. Bishop, Jr., and Jacob L. Neff. Decree for defendants.

W. H. Arnold and M. E. Sanderson, both of Texarkana, Ark., for complainant.

L. A. Byrne, for defendant Bishop.

Henry Moore, Jr., of Texarkana, Ark., for defendant Neff.

ROGERS, District Judge. A careful examination of the record in this case discloses the following state of facts:

The complainant, on January 2, 1908, gave the defendant Bishop an option for the lands in controversy, and during that month Bishop paid complainant $1,000 therefor. The option was in writing and re-

cited the price of the lands at $25,000 cash, on certain conditions therein stated. The option was to expire on March 1, 1908, and provided that, when Bishop elected to take the land and pay $1,000, complainant was, within 10 days thereafter, to furnish an abstract showing a good and sufficient title, under the laws of Arkansas, and to execute deed therefor. It also provided that, if the purchase was made the $1,000 already paid was to go as part of the purchase price. If the title should not turn out to be good, the $1,000 was to be returned to Bishop, and if it turned out to be good, and Bishop refused to purchase the land under the terms of the option, then Bishop was to forfeit the $1,000 to the complainant. Meantime, however, on January 14, 1908, the option by written contract was changed, so that the terms of payment were as follows, to wit: $8,500 cash, less the $1,000 paid that day, and $16,500 due January 1, 1909—and, thus modified, the option was to stand until the 1st of March, 1908. The abstract furnished by complainant thereafter was not perfected, so as to show good title, and on the 1st of March the option expired by its terms. After March 1, 1908, no other option terms of sale were ever offered by the complainant, but Bishop and complainant's attorney and agent continued to negotiate, dicker, and jockey with each other, in an effort to close the deal on the terms stated in the expired option.

Meantime, and while the option was in force, Bishop had interested his codefendant, Neff, in the option, and induced him to agree to buy a half interest in the lands for $17,500. That agreement was in writing, and was dated January 31, 1908, To accomplish this he induced complainant's attorney to give him a bogus option, substantially the same as the one he already had, except the price was stated at $35,000, instead of $25,000, as recited in the option of January 2, 1908, and the bogus option was antedated, so as to make it appear that it was executed on January 14th, the same day Bishop had paid the $1,000 on the option. He also induced the complainant's agent for the sale of the land to wire him the purchase price was $35,000. It is not left in doubt by the evidence that Bishop intended to use this bogus option and telegram to promote the sale to Neff on the basis of $35,000; whereas he already had an option to purchase the place at $25,000. Nor is there any doubt that complainant's attorney and agent both knew what Bishop wanted with the bogus option and telegram. Bishop denied having shown the bogus option to Neff until Neff had agreed to pay $17,500, being one-half purchase price of the land, $500 of which he paid in cash, and of the remaining $17,000 agreed to pay $8,750 on or about March 1, 1908. Bishop admits that he promised, before or at the time Neff paid him the $500, to show him the option contract which contained the terms of the proposed purchase. This he never did, but instead showed him the bogus option contract.

Neff testifies Roberts did show him the bogus contract before he agreed to buy, and solicited him to buy on the same terms he (Bishop) had bought from complainant. Whatever may be the truth on this point, it is certain that Bishop had represented to Neff that the option price was $35,000, and confirmed it by the bogus contract, in which

price was recited as $35,000. It is also true that Neff never saw the option contract of January 2, 1908, or knew of its existence or its terms, until after this suit was brought. After the option expired, on March 1, 1908, all the negotiations had, between complainant, his agent, and attorney, on the one side, and Bishop and his attorney, on the other side, proceeded on the basis of the option contract of January 2, 1908, so far as terms of payment was concerned. As soon as Bishop made his agreement with Neff, Bishop's attorney, Byrne, seems to have practically dropped out of sight, and Bishop relied on Neff's attorney, whose duties related solely to passing on the title. The attorney suggested many defects to complainant, and his agent and attorney endeavored to comply, and make the corrections, but never to the satisfaction of Neff's attorney, who also represented Bishop as to the title.

It finally came to this: That Bishop was willing to close the deal, but Neff was not satisfied with the title. Bishop, to use his own language, could not "swing the deal" without Neff's aid; he could not get Neff's aid until Neff's attorney was satisfied as to the title; complainant could not satisfy Neff's attorney as to the title, and hence Bishop would not close the deal, mainly because, presumably, he could not raise the cash payment. Bishop's willingness to close the deal is easily explained, because, under the arrangement into which Neff had been inveigled if the deal went through he (Bishop) had only to pay, in addition to the $500 he had already paid, $7,000 (and that not due until January 1, 1909), and become half owner of a plantation which cost $25,000, while Neff would be out $17,500 for a half ownership in the same plantation. Naturally Bishop could afford to take chances on titles, which Neff could not. While the matter stood in this shape, the parties wrangling over the title, the overflow came, and the place was greatly damaged, and the crop lost. Immediately all negotiations ceased, and the suit followed.

[1, 2] It is clear that Neff was never bound to complainant in any respect, and had no contract with him; his contract was with Bishop, and was conditional. The conditions were never performed, and Neff was not bound to Bishop. No cross-bill would, therefore, lie in this case on the state of facts disclosed; and hence the application to file it is denied. Neff not being under any contractual obligations to complainant, as to him the original bill would not lie. Bishop having failed on account of defects in the title to close the option before it expired, and the option never having been renewed between him and complainant, none existed when the overflow came and the negotiations ceased; but it may be said, if the option had been in existence and complainant had furnished an abstract showing a perfect title, so that Bishop became obligated to buy the land, by the very terms of the option contract of January 2, 1908 (and there never was any other), if Bishop refused to close the option no penalty resulted, except the loss of his $1,000 which had been paid upon the option.

Much is said and some reliance seems to be placed on the fact that Bishop had complainant make a deed to himself and Neff, and that complainant's brother had entered into a written contract, and had

executed a note for $4,000 to pay the rent of the plantation for the year 1908; the note being made payable to Bishop and Neff. Those matters are unimportant. No doubt Bishop wanted to use the rent note and contract as an additional lever to influence Neff to buy, and he wanted the deed ready, so that, if Neff did buy, he could close the deal without delay, and thereby avoid any further risk of Neff's discovering that he had been beaten out of $10,000 in the deal with Bishop; but these circumstances were all taken conditionally, and the parties could not have understood otherwise, and their actions throughout were upon that theory. They were taken while the option was pending, and if the option fell they fell with it necessarily; otherwise, Bishop and Neff would be getting the rent on land they did not own, and had not even agreed to purchase. It is unprofitable to pursue that branch of the case any further.

The principles of law governing options are stated by the Eighth Circuit Court of Appeals in the case of James et al. v. Darby, 100 Fed. 224, 40 C. C. A. 341, and are as applicable to the case at bar as that case.

The bill will be dismissed as to both defendants, and the attachment discharged, at the costs of complainant.