UNITED STATES v. P. J. CARLIN CONST. CO. et al.

(Circuit Court of Appeals, Second Circuit. May 12, 1915.)

No. 4.

1. CONTRACTS ⊂⇒32—PROPOSAL AND ACCEPTANCE—AGREEMENT TO MAKE CON-
TRACT.

When parties enter into a mere verbal agreement, with the understand-
ing that it shall finally be reduced to writing as the evidence of the terms
of the contract, it may be that nothing is binding upon either party until
the writing is executed; but where the parties, through correspondence,
reach a specific and definite agreement, intending that the agreement shall
be subsequently expressed formally in a single paper, which, when signed,
shall be the evidence of what had been agreed upon, the obligatory char-
acter of the agreement cannot ordinarily be defeated by the failure of
either party to sign the formal contract.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. § 159; Dec. Dig.
⊂⇒32.]

2. CONTRACTS ⊂⇒24—OFFER AND ACCEPTANCE—CONDITIONAL ACCEPTANCE.

An acceptance, to create a binding contract, must correspond to the offer
at every point, and must conclude the agreement.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 100–103; Dec.
Dig. ⊂⇒24.]

3. UNITED STATES ⊂⇒64—CONTRACTS—ACCEPTANCE OF BIDS.

In inviting bids for government work to be done for the War Depart-
ment, each bidder was required, in accordance with the provisions of Act
April, 10, 1878, c. 58, 20 Stat. 36, as amended by Act March 3, 1883, c. 120,
22 Stat. 487 (Comp. St. 1913, § 6843), to furnish a certified check or a bond
as a guaranty that, if his bid was accepted, he would enter into a con-
tract. Defendant submitted a bid, accompanied by a bond conditioned that,
on acceptance of its bid within 60 days from the opening of the proposals,
it would enter into the contract, which bond was accepted. Defendant
was notified of the acceptance of its bid, with a certain proviso, to which it
refused to agree. Afterward, but more than 60 days after the bids were
opened, it was notified of unconditional acceptance, but refused to execute
the contract. *Held*, that the acceptance of its bid was not only not within
a reasonable time, but that the government, having accepted the bond with
its 60-day limitation, could not insist that it had a longer time, and its
acceptance afterward did not bind defendant or its surety.

[Ed. Note.—For other cases, see United States, Cent. Dig. § 47; Dec. Dig.
⊂⇒64.]

In Error to the District Court of the United States for the Southern
District of New York.

This cause comes here on writ of error to review a judgment of
the United States District Court for the Southern District of New
York, entered on January 2, 1913, dismissing the complaint on the
merits. The action was brought to recover the sum of $115,000, re-
duced by the plaintiff at the trial to $80,000, as damages for the fail-
ure of the Carlin Company to enter into a contract.

H. Snowden Marshall, U. S. Atty., of New York City, and Addison
S. Pratt, Sp. Asst. U. S. Atty., of New York City.

John C. Wait, of New York City, for defendant in error J. P.
Carlin Const. Co.

Charles A. Winter, of New York City, for defendant in error
Illinois Surety Co.

Before COXE, WARD, and ROGERS, Circuit Judges.

ROGERS, Circuit Judge. The government of the United States, acting through its agents, advertised, in March, 1908, that it would receive sealed proposals for the construction of certain improvements to be made at Ft. Mason, San Francisco, Cal., which work was to be done in strict accordance with drawings and specifications. Bids were to be received until noon May 4, 1908, when they were to be publicly opened. The specifications required each bidder to submit with his proposals either a certified check for $10,000, or a surety company bond equal to 10 per cent. of the amount of his proposal, as a guaranty that the contract and bond required by the specifications would be executed within 10 days after the successful bidder had been notified that his bid had been accepted.

The Carlin Company in due time submitted its proposal to do the work for $1,178,000 and to complete it within 30 months. This was its "Lump Bid A." In its "Lump Bid B" it proposed to complete the work on alternative drawings and specifications of its own, using reinforced concrete caisson construction, and agreeing to complete it in 27 months. With its proposal it submitted a bond of the Illinois Surety Company, whereby the latter guaranteed that, if the bid of the Carlin Company was accepted within 60 days from the opening of the proposals, the latter would enter into a contract for the performance of the work and give bond for the faithful fulfillment thereof within 10 days after notice of acceptance, or the Surety Company would pay the United States the difference in money between the amount of the bid and the amount for which the United States might contract with another, not exceeding $125,000. Upon the opening of the bids the Carlin Company was found to be the lowest bidder.

The drawings and specifications which the Carlin Company submitted with its "Lump Bid B" were not sufficiently in detail to be satisfactory to the officials of the government, and the Carlin Company agreed to submit more complete plans and specifications. But there was delay in so doing, and on June 18, 1908, and before the Carlin Company had furnished the completed plans and specifications, which it was to submit in connection with its "Lump Bid B," a letter was sent to the Construction Company by the Quartermaster General of the United States Army informing it that instructions had been issued to make award of the contract—

"to your company in accordance with your proposals, based upon the government plans and specifications as follows: The entire work called for by plans and specifications, except sheds on wharf No. 1 and wharf No. 3. He has been further instructed to insert a clause in the contract whereby the government reserves the right to enter into supplementary agreement with your company for the construction of the sea wall, in accordance with your alternative bid, at a reduction of $80,000, provided satisfactory plans and specifications for this alternative design shall be submitted to and approved by this office within six months from the date of award. This has been rendered necessary because certain minor points in your design for the sea wall recently submitted to this office are not satisfactory. This clause in the contract is desired in order to enable the immediate award of contract, and to give your company ample time in which to submit completed plans for the alternate sea wall; it being understood that it is entirely optional with the government to decide whether or not the sea wall shall be built according to the original plans and specifications or in accordance with the alternate bid, provided a decision is arrived at within six months from date of award.

Additional clauses for the specifications will provide for certain other omissions and additions which were verbally agreed to by Mr. Carlin while in this office."

Correspondence followed between the parties, the Construction Company making objection to the contract as proposed by the government in the letter of June 18, 1908, and declining to accept it. In a letter dated June 20th, Mr. Carlin after stating objections wrote:

"It is manifestly impossible for us to consider the signing of a contract, which places in abeyance, for a period of six months, the determination of a question, without which determination it will be impossible for us to begin. We should be glad to know what provision it is proposed to insert in the form of contract, regarding responsibility for the construction of the work, if the original plans are followed."

To this the government replied on June 24th:

"The award for the construction of the wharves at Ft. Mason, San Francisco, Cal., was ordered made to you on your straight bid for this work. Had you complied strictly with the specifications and instructions to bidders, and submitted complete plans and specifications of the alternate sea wall, the question of a delay in definitely determining the type of sea wall to be used would have been entirely obviated. As it now stands the bid on the government design has been accepted, and the proposed clause in the specifications simply gives you an opportunity to submit an entirely satisfactory design under your alternate bid within six months from the date of the award of the contract. It therefore gives you an opportunity to build the sea wall in accordance with your own design. This clause was inserted in the contract to give you every opportunity to use your alternate design, and you have had no reason at any time for assuming that only the alternate plan would be considered. Your bid is definite, and the acceptance is definite."

On the same date the government wrote the Construction Company that its proposal opened on May 4th was—

"hereby accepted as follows: (1) Item 1 of the bid, $1,178,000, being the lump bid for the construction of the sea wall, crib wall, transport wharves, and sheds complete, as shown by drawings and specifications, deducting item 7, being a reduction of $63,000 for omitting shed complete on wharf No. 1, and item 9, being a reduction of $60,000 for the omission of shed complete on wharf No. 3, making a total award of $1,055,000 for the construction complete, including sea wall, necessary dredging, and filling for the entire project as covered by plans and specifications, except sheds on wharf No. 1 and wharf No. 3."

The letter then went on to state three separate modifications of the contract which the government desired:

"It is desired that a clause be inserted into the contract reserving to the government the right within six months from the date of award to enter into an extra agreement for the construction of the sea wall under the alternative bid of the P. J. Carlin Construction Company at a reduction in price of $80,000, provided satisfactory plans and specifications, based upon their alternative bid, be submitted to and approved by this office within the time mentioned.

"III. It is further desired that a clause be inserted in the specifications providing for the omission of the crib wall along the Laguna street side of the reservation, in accordance with item 10 of the bid, at a reduction of $90,000, provided written notice is served on the contractor prior to six months after date of award of contract.

"IV. It is further desired that a clause be inserted in the contract providing for the construction of sheds on wharf No. 1 and wharf No. 3, which have been omitted in this contract, provided funds become available and the award made within one year from the date of approval of this contract, at the fixed sums of $63,000 and $60,000, respectively.

"Bond to the amount of $450,000 will be required. Please wire this office whether the officer of your company authorized to sign the contract will be in San Francisco ready to sign in the near future, or where the contract as soon as prepared should be sent for his signature. It is absolutely necessary that this contract should be signed at once, and that work should begin as soon as possible."

To the above communication no reply was made, and on July 1st, the government, through the constructing quartermaster at San Francisco, sent a letter to the Construction Company in which it inclosed three copies of the contract, dated July 1st, and stated to be "for the signature of whomever is authorized to sign the contract." The contract thus transmitted to be signed included the three propositions or clauses which the government declared, in the letter of June 24th, that it desired to have inserted in the contract. Then followed on July 7th a letter from the Construction Company to the government at Washington, in which attention was called to the reservations which the government had made in the contract which had been submitted, and also to the fact previously "stated verbally in Washington" that the company had discovered a serious error in its original proposal, amounting to over $100,000. The letter concluded that, for reasons stated therein, "we are constrained to ask that our bid be withdrawn, and that we be not compelled to enter into contract for this work."

Two days later, on July 9th, the Quartermaster General wrote the Construction Company:

"In reply to your communication of July 7th, and on the general subject of the award of contract for the construction of wharves for the transport service at Ft. Mason, San Francisco, Cal., you are informed that the acceptance of your bid and the award of contract is on your straight bid on the government plans and specifications, as you were informed in letters from this office of June 18th and June 24th, and any clause in the contract not provided for in your bid was subject to mutual agreement, and since it appears that you are not willing to accept the conditions which a representative of your firm verbally agreed to in this office, contracts which are drawn in strict accordance with your proposal are herewith inclosed, and you are requested to execute them at once and submit them to this office, with a satisfactory bond to the amount of $450,000."

The correspondence shows that the government forwarded a formal written contract to the Construction Company on July 1st, which it was desired the Construction Company should execute; and that on July 9th another draft of a contract was sent the company to execute. But neither of these contracts was ever signed. Did the failure of the Construction Company to sign a formal contract affect in any way the respective rights of the parties?

[1] When parties enter into a mere verbal agreement, with the understanding that it shall be finally reduced to writing as the evidence of the terms of the contract, it may be that nothing is binding upon either party until the writing is executed. But where the parties reach an agreement through correspondence, intending that the agreement shall be subsequently expressed formally in a single paper or document, which, when signed, should be the evidence of what had been agreed upon, the obligatory character of the agreement cannot ordinarily be defeated by the failure of either party to sign the formal contract. If the court can see from the writings or correspondence

that the minds of the parties have met, that a proposal has been submitted by one party which has been accepted by the other, and that the terms of the contract have been in all respects definitely agreed upon, one of the parties cannot evade or escape from his obligation by refusing to sign the formal contract, which the parties understood was subsequently to be drawn and executed. As said by the New York Court of Appeals in Sanders v. Pottlitzer Bros. Fruit Co., 144 N. Y. 209, 214, 39 N. E. 75, 76, 29 L. R. A. 431, 43 Am. St. Rep. 757 (1894):

"Any other rule would always permit a party who has entered into a contract like this through letters and telegraphic messages to violate it whenever the understanding was that it should be reduced to another written form. by simply suggesting other and additional terms and conditions. If this were the rule, the contract would never be completed in cases where by changes in the market or other events occurring subsequent to the written negotiations it became the interest of either party to adopt that course in order to escape or evade obligations incurred in the ordinary course of commercial business."

And in Thomas v. Derring, 1 Keen, 729 (1837), Lord Langdale, Master of the Rolls, stated the rule as follows:

"I have no hesitation in saying that, by the offer made and accepted as it appears to have been in this correspondence, a binding contract was completed between these parties. It is true that mention is made in the letters of an intended formal contract, to be afterwards drawn up; but there are many cases in which a correspondence, referring to the future execution of a more formal agreement, has been held to constitute in itself a valid contract, and I think that the correspondence is equivalent to a contract in the present case."

The above cases relate to contracts between individuals. The same rules which govern the validity and sufficiency of contracts between individuals control, as a general rule, in case of contracts with the government. It is important, however, to keep in mind that the laws of the United States make it necessary that contracts of the nature of that upon which this suit is based are required to be in writing and signed by the contracting parties and filed in the appropriate office. United States Compiled Statutes 1913, vol. 3, § 6899, provides that:

"It shall be the duty of the Secretary of War, of the Secretary of the Navy, and of the Secretary of the Interior to furnish every officer appointed by them with authority to make contracts on behalf of the government with a printed letter of instructions, setting forth the duties of such officer, under the two preceding sections, and also to furnish therewith forms, printed in blank, of contracts to be made, and the affidavit of returns required to be affixed thereto, so that all the instruments may be as nearly uniform as possible."

The meaning of the provision of the law above cited was under consideration in South Boston Iron Company v. United States, 18 Ct. Cl. 165 (1883). The claimant corporation had submitted in writing proposals to furnish boilers for certain naval vessels. These proposals were accepted in writing by the proper government official. Nine days thereafter, and before the formal contract had been signed, a new Secretary of the Navy repudiated the action which had previously been taken. Thereupon the claimant corporation brought suit against the United States for damages in the sum of $2,000,000 for breach of

contract. The question was whether the correspondence showing an
·offer and an acceptance amounted to a contract. And the court held
that there was not a binding contract. The court said:

"The English statute of frauds provides that one class of contracts shall
·be 'put in writing and signed by the parties,' and for another class it pro-
vides that 'the agreement or some memoranda or note thereof shall be in
writing and signed by the party to be charged therewith.' The language of
·these statutes has been generally followed in legislation of this country. To
determine what kind or form of writing and signing came within the re-
·quirements of this phraseology has been the object of the great number of
judicial decisions, some of which have been cited here. But in the law under
·consideration the words 'some memorandum or note thereof' are omitted, and
the words 'with their names at the end thereof' added. Immediately preced-
ing these added words the statute had already provided all that the English
statutes required, to wit, that 'the contract should be in writing and signed
by the contracting parties.' It is plain that some additional requirement is
involved in the words 'with their names at the end thereof.' They are not
·repugnant to any other part of the act. They cannot be meaningless. The
same idea has been discussed in legislative bodies, and one state at least has
required certain contracts 'to be signed at the foot.' Congress inserted these
words for a purpose, and courts must give them effect. We cannot shave off
·the language of an act of Congress to bring its meaning within less restricted
language, common in statutes of fraud. These additional words cannot mean
less than that the contract shall be so full and complete before signing that
it can be signed in whole by both parties. It excludes the idea that one party
may sign one part of the contract and the other party another and leave the
·courts to arrange a contract by collecting and joining the pieces. That can
be done, as has been often held, under the English statute, but not under ours,
unless we entirely erase the words 'with their names at the end thereof.'
·This construction is strengthened by the other provisions of the act before
noted, especially by those which require the Secretaries to furnish blank forms
in order 'that all the instruments may be as nearly uniform as possible,' and
the contracting officers to file with the copy of the contracts copies of all
·'bids, offers, and proposals.' It is doubtless true that the contractor is not
bound to see that the officer obeys all these directions, but he is bound to
know that they are in the law, and that it does not become him to aid a
reckless officer to evade them. If this is the proper construction of the
·statute, negotiations, correspondence, proposals, and acceptances, although con-
ducted in writing, but signed only in part by one party and in part by the
·other, do not constitute the required complete contract signed in whole by
both parties. At most they are only preliminary memoranda to be used in
drawing a contract so complete that it can be 'signed by the contracting par-
ties with their names at the end thereof.' * * * It may be considered
settled that so much of section 3744 as provides that contracts shall be 're-
·duced to writing and signed by the contracting parties with their names at
·the end thereof' is mandatory, and contracts which do not comply with its
requirements are void. Henderson's Case, 4 Ct. Cl. 75; Clark v. United
States, 95 U. S. 539 [24 L. Ed. 518]. In this case a whole and complete con-
tract was not signed by either party. The claimant signed the proposals and
·the defendant the acceptances. Neither party retained possession of all the
·original parts. The defendants retained possession of the original proposals
and the claimant of the original acceptances. The drawings and specifica-
tions, which were to become a very important part of the contract, were not
·in writing at the time, nor even considered and determined upon."

This construction as to the effect and meaning of the statute was af-
firmed in the Supreme Court, to which the case was carried on writ of
error. That court said:

"An effort has been made in this case to show a contract in writing, but we
agree entirely with the Court of Claims that the papers relied on for that
·purpose are nothing more in law or in fact than the preliminary memoranda

made by the parties for use in preparing a contract for execution in the form required by law. This was never done, and therefore the United States never became bound." South Boston Iron Co. v. United States, 118 U. S. 37, 6 Sup. Ct. 728, 30 L. Ed. 69 (1886).

The answer of the Construction Company, and of the Surety Company as well, sets up that neither party was bound by the offer and acceptance until in accordance with section 3744 of the Revised Statutes (Comp. St. 1913, § 6895) the contract was actually executed by being signed by the contracting parties with "their names at the end thereof." As no such contract was ever signed by the parties, no obligation was imposed, if section 3744 governs the negotiations. However, to whatsoever class of contracts the above section may be applicable, it clearly does not apply to the transactions involved in the present suit. The transactions, on the contrary, are subject to Act of April 10, 1878, c. 58, 20 Stat. 36, as amended by Act March 3, 1883, c. 120, 22 Stat. 487, which was in force at the time and which provided as follows:

"That the Secretary of War is hereby authorized to prescribe rules and regulations to be observed in the preparation and submission and opening of bids for contracts under the War Department. And he may require every bid to be accompanied by a written guarantee, signed by one or more responsible persons, to the effect that he or they undertake that the bidder, if his bid is accepted, will, at such time as may be prescribed by the Secretary of War or the officer authorized to make a contract in the premises, give bond, with good and sufficient sureties, to furnish the supplies proposed or to perform the service required. If after the acceptance of a bid and a notification thereof to the bidder he fails within the time prescribed by the Secretary of War or other duly authorized officer to enter into a contract and furnish a bond with good and sufficient security for the proper fulfillment of its terms, the Secretary or other authorized officer shall proceed to contract with some other person to furnish the supplies or perform the service required, and shall forthwith cause the difference between the amount specified by the bidder in default in the proposal and the amount for which he may have contracted with another party to furnish the supplies or perform the service for the whole period of the proposal to be charged up against the bidder and his guarantor or guarantors, and the sum may be immediately recovered by the United States for the use of the War Department in an action of debt against either or all of such persons."

Under the provisions of the above act the government is entitled, upon the failure to enter into the contract of one who has submitted a bid which has been accepted for a contract under the War Department, to proceed to contract with some other person and to recover the difference in the cost of the work in an action against the defaulting party.

[2] It is necessary, therefore, to determine whether the government duly accepted the offer submitted by the Construction Company. If the offer was never properly accepted, the government cannot maintain this action. It appears that on June 18th the government notified the Construction Company that it would accept the latter's bid with this proviso, that a period of six months must elapse within which to determine whether the government would have the work done according to plan A or according to plan B. This cannot be regarded as an acceptance of the offer. It is elementary that an acceptance must correspond to the offer at every point, and must conclude the agreement. But under the terms of the communication of June 18th the agreement

224 F.—55

was not to be concluded unless the government sooner chose to do so until six months elapsed. The Construction Company was under no obligation to consent to this arrangement and refused its assent. Then on July 9th the government by letter accepted the bid on plan A. This was 60 days after the opening of the bids.

[3] An acceptance of an offer to be effective, if no time is fixed in the offer, must be made within a reasonable time. What is a reasonable time is determined by the circumstances or nature of the case. Sometimes it is a question of law for the court, and sometimes one of fact for the jury. 9 Cyc. 292. The court below held that upon the circumstances of this case the government, as a matter of law, had not accepted the offer of the Construction Company within a reasonable time. It appears that at the time the government invited bids it provided that a bidder should do either of two things, put up $10,000 in cash (certified check), or give a bond by a responsible surety company that the bidder would execute the contract. The Construction Company elected to give a bond. That bond, executed by the Illinois Surety Company, guaranteed that if the Construction Company's bid was accepted "within 60 days from the date of the opening of proposals" the Construction Company would within 10 days after notice of acceptance enter into the contract. This bond the government accepted, and having accepted it, with this limitation in it as the period within which the bid was to be accepted, the government is not now at liberty to say that it had more than 60 days within which it could determine whether it would accept the Construction Company's offer.

As the right of the government under the act of 1878 to sue to recover the difference between the amount bid by the Construction Company and the amount for which the government subsequently contracted with another party depends upon the fact that the government had duly accepted the Construction Company's bid, and as no such acceptance was ever duly made, there was no error in dismissing the complaint upon the merits.

Judgment affirmed.