## CRANCER et al. v. LAREAU et al.

(Circuit Court of Appeals, Eighth Circuit. August 11, 1924.)

No. 6496.

1. **Logs and logging** ⊜⟹3(1)—**Option to purchase timber, on condition price be paid before expiration of option not exercised by cutting.**

Exclusive option to purchase within two years timber adjoining timber bought by optionee, on condition that agreed price be paid before expiration of option, could be exercised only by payment of price within agreed time, and optionee, by wrongfully cutting and removing timber did not elect to exercise option.

2. **Contracts** ⊜⟹143—**Court cannot make new agreement for parties.**

Court cannot make new agreement or material modification of old agreement for parties, and no principle of law or equity will support judgment or decree based on agreement, which parties did not make for themselves.

**3. Sales** ⊗—24—**Vendor and purchaser** ⊗—18(3)—**Acceptance of option must bind both parties.**

Acceptance of option to purchase must be such compliance with condition as to bind both parties, and if it fails to do so it binds neither.

**4. Frauds, statute of** ⊗—118(3)—**Letters between parties to option contract for purchase of land held incompetent.**

Under laws of Missouri making growing trees part of realty, and Rev. St. Mo. 1909, § 2783, requiring contract for sale of lands to be in writing, letters between parties to written option to purchase timber, on condition that price be paid before expiration of option, *held* incompetent to show modification of written contract.

**5. Sales** ⊗—24—**Vendor and purchaser** ⊗—18(3)—**Where payment of price is condition precedent, notice of intention to accept option futile.**

Where payment of price is condition precedent to acceptance of option, verbal or written notice of intention to accept, or acceptance without payment of price, is not valid acceptance or election to take advantage of option, and is futile.

**6. Vendor and purchaser** ⊗—82, 85—**Parol proof of release or modification of written realty contract must clearly and convincingly establish terms of new contract.**

Parol proof of release from valid written realty contract, or of new or radical modification of old contract, must clearly and definitely establish terms thereof, and that minds of parties met and agreed on those terms at same time.

**7. Logs and logging** ⊗—3(15)—**Evidence held not to show meeting of minds on modification of option to purchase.**

Evidence *held* not to show meeting of minds on any definite modification of agreement requiring payment of price, as condition precedent to acceptance of option to purchase timber.

In Error to the District Court of the United States for the Western District of Missouri; A. L. Reeves, Judge.

Action by Adelaide Lareau and another against E. W. Crancer and another. Judgment for plaintiffs, and defendants bring error. Reversed and remanded, with directions.

W. W. Hooper, of Leavenworth, Kan. (Addison Brown, of Springfield, Mo., on the brief), for plaintiffs in error.

W. J. Orr, of Springfield, Mo., and Kirby Lamar, of Houston, Mo., for defendants in error.

Before SANBORN and LEWIS, Circuit Judges, and SCOTT, District Judge.

SANBORN, Circuit Judge. The plaintiffs below, defendants in error here, recovered a judgment after a jury trial against the defendants, plaintiffs in error here, for $5,050 on two alleged causes of action springing from a written contract between the plaintiffs and Charles D. Bell, made on September 14, 1920, whereby the plaintiffs agreed to sell for $7,500 1,000 acres of timber trees out of 1,840 acres they owned, and Bell agreed to buy and pay $7,500 for them on or before August, 1921, and whereby they also agreed that Bell, or his assigns, "should have the exclusive option of purchasing the balance of the timber, trees, and lumber on said above-described land, at $7.50 per acre, save and except approximately 200 acres thereof now inclosed by fence, provided the same is paid for within two years from and after the first payment above mentioned." That first payment was the first payment on the purchase price for the 1,000 acres, which was required to be and was made on October 15, 1920; and by the terms of this contract relating to the other 640 acres of timber, Bell or his assigns, on condition that he or they paid $7.50 per acre for them on or before October 15, 1922, might acquire the exclusive option of purchasing them from the plaintiffs. On September 21, 1921, Bell assigned this contract and all his rights thereunder to the defendants, who paid the purchase price of the 1,000 acres in full to the plaintiffs on or before April 20, 1922.

[1] On May 12, 1922, the plaintiffs sued the defendants for the $4,800, by the payment of which, at any time before October 15, 1922, the defendants had the right by the terms of the contract to acquire the exclusive option to purchase the 640 acres, and the plaintiffs alleged in their complaint that the defendants had cut timber and trees on the 640 acres of land, and had elected to exercise the option they had to purchase it. This constituted the first and principal alleged cause of action in this case. The second cause alleged by the plaintiffs was that the contract provided that in the cutting and removing of the 1,000 acres of timber the defendants should leave the stumps not over 8 inches above ground, where practicable, and that they should pile the brush and limbs ready for burning, and the plaintiffs alleged that the defendants had left the stumps more than 8, and the greater portion thereof more than 15, inches in height, and had failed to properly cut the stumps and pile the brush, to the damage of the plaintiffs in the sum of $1,000. The defendants by their answer denied that they had in any way elected to exercise or acquire the option to purchase the 640 acres of timber, and denied that they had failed to comply with any of the terms of their contract. At the close of the evidence there had been none to the effect that the parties to the contract had ever, by agree-

ment or otherwise, separated by lines, marks, or otherwise the 1,000 acres of timber sold and paid for from the 640 acres of timber, which the plaintiffs by the written contract offered the defendants an option to purchase on condition that they paid therefor $4,800 on or before October 15, 1922, and the only criterion by which to determine what timber had been or was on the 1,000 acres was that clause of the contract which provided that the cutting of the 1,000 acres of timber should commence "at a point where the road leading from Cabool to the residence of said first parties crosses the south line of the property above described (which was the entire 1,840 acres), and that said 1,000 acres shall be cleared as nearly as practicable in one body." There had been substantial testimony that the employees of the defendants had cut and removed a considerable quantity of trees and timber from the 640 acres, but the evidence was too indefinite and contradictory to indicate with any reasonable degree of definiteness the amount of timber or the value of timber taken. In this state of the case the court charged the jury that: "If you find that it was practicable for the defendants to have cut and cleared the 1,000 acres bought by the terms of the contract in one body, and that during the two years while the option or offer was open they, through their agents and servants, went onto the remaining 640 acres of land belonging to the plaintiffs, and cut and removed the timber therefrom, then such acts, as a matter of law, constitute an acceptance by defendants of the timber on said 640 acres, and the defendants are liable to the plaintiffs for $7.50 per acre for such timber, amounting to $4,800; and if you find the above facts to be true, then you should find the issues for the plaintiffs on the first count of the petition, and assess their damages at $4,800 on the first count of said petition."

The defendants excepted to this charge and here insist that it was erroneous. According to this charge, if a farmer had 20 bales of hay, and offers to sell them to his neighbor on condition that the latter within 10 days pays him $200 therefor, and the neighbor, without paying the $200, wrongfully takes and appropriates to his own use 2 or 3 of the bales, he thereby accepts the offer and makes a contract binding on both himself and the other farmer. If an owner offers to a customer the exclusive option of purchasing 5 specific automobiles, on condition that the latter pays $10,000 for them within 30 days, and his customer wrongfully

takes 1 or 2 of them the next day and pays nothing, he thereby makes a contract of purchase and sale between himself and the owner, which binds both. This does not seem to be a reasonable or practical rule. The only argument presented in support of it by counsel for the plaintiffs is: "The defendants were not required to evidence their election to take this 640 acres of timber in any different manner than they took the timber from the 1,000 acres. All they did with reference to the 1,000 acres was to cut the timber. This 1,640 acres was all inclosed and in one body. They went upon this tract of land, and cut all of the timber on the 1,000 acres, and then cut the best on the 640 acres, as the evidence warrants and the jury found." But this argument is futile, because the premises on which it is based do not exist, and never did exist. It is not true that all that the defendants ever did with reference to the 1,000 acres was to cut the timber. Their assignor first made a written agreement, signed by him and by the plaintiffs, to cut, remove and pay $7,500 for the trees on the 1,000 acres. The defendants purchased and assumed the liability to pay that sum for the timber on this 1,000 acres, and they did pay that amount for it, and cut and removed it. The defendants were expressly required by the written contract to evidence their election to take and exercise the option offered them on the 640 acres in a different manner, to wit, by the payment therefor of $4,800 on or before October 15, 1922.

The only authorities counsel cite in support of this part of the charge of the court are Lindell v. Rokes, 60 Mo. 249, 21 Am. Rep. 395, Allen v. Chouteau, 102 Mo. 309, 14 S. W. 869, and the recital in some of the text-books of the indisputable rule that an offer may be accepted or an election to accept or exercise an option may be made by acts or conduct requisite to have that effect; for example, in the case at bar, by the performance of the express condition precedent to the making of the contract of sale—the payment of the $4,800 on or before October 15, 1922. In Lindell v. Rokes, 60 Mo. 249, 21 Am. Rep. 395, the latter agreed in writing to pay Lindell $50 if from July 1, 1872, to March 18, 1873, he would not use intoxicating liquors of any kind. He did not, and the court sustained his action against Rokes for the $50. In Allen v. Chouteau, 102 Mo. 309, 14 S. W. 869, Chouteau wrote Allen that, if he would pay all taxes on certain described lands, he (Chouteau) would refund the amount paid and interest. Allen paid the

taxes on the land and died. His executors sued Chouteau for the money advanced by him, and recovered. The court in its opinion placed its decision on the rule that "full performance of the consideration of an offer, before the offer is withdrawn, constitutes an acceptance of the offer." There is nothing in the decision or in the opinion in these cases or in the references to the textbooks made by counsel for the plaintiffs in support of their argument here or of the charge of the court under consideration. As applied to the case in hand, they merely hold that if the defendants, on or prior to October 15, 1922, had paid to the plaintiffs the $4,800 specified in the offer of the option as a condition precedent to its acceptance, they thereby would have consummated a contract of purchase of the 640 acres of timber binding upon both parties. But they never paid that sum or any part of it.

[2] In order to make the wrongful cutting and taking by the defendants of some of the timber and trees on the 640 acres a compliance with the condition precedent to the contract of sale expressed in the contract in these words, "Provided the same (the 640 acres of timber) is paid for within two years from and after the first payment above mentioned is made to first parties," it was indispensable that a new contract should be made between the parties to the effect that this condition precedent should be, "Provided the parties of the second part wrongfully cut and remove some timber and trees from the same, or the same is paid for within two years from and after the first payment of money above mentioned is made to first parties." The court, however, was powerless to make a new agreement or a material modification of the old agreement between these parties as to the option, and the court did not condition its charge that the wrongful cutting and taking of the trees on the 640 acres constituted an election to accept the offer of the option by a finding of the jury that the parties to the contract had agreed to modify the condition to that effect. No principle of law or equity will support a judgment or decree based on an agreement which the parties thereto did not make for themselves. Hepburn v. Dunlop, 1 Wheat. 178, 198, 4 L. Ed. 65; Waterman v. Banks, 144 U. S. 394, 401, 12 Sup. Ct. 646, 36 L. Ed. 479.

The contract of these parties concerning the 640 acres of timber was plain and clear. It is an agreement of the plaintiffs to give to the defendants the option to purchase this timber on or before October 15, 1922, on the sole condition precedent that they should pay the plaintiffs $4,800 for it on or before that day. It bound the plaintiffs to sell the property to the defendants at any time before October 15, 1922, on condition that they paid the $4,800 on or before that date, and on no other condition, and it left the defendants free to accept and exercise the option or to refuse to do so until after they paid the $4,800 on or before October 15, 1922. "Where the exercise of an option depends upon the performance of acts which are in their nature or by express agreement made conditions precedent to such exercise, all such acts must be strictly performed. Thus it has been held that an option to buy is not properly exercised by merely accepting the terms proposed, but must be fully completed by payment within the time limited." 21 American and English Encyclopædia of Law (2d Ed.) 930. Pomeroy, in the second edition of his work on Specific Performance, at section 334, says: "Where a contract is thus conditional—that is, where it rests upon a condition precedent—until the performance of the condition it cannot be enforced, because, until that time, there is no true contract."

This court has repeatedly held that "the rule is unvarying, and the authorities uniform, that in order to constitute an acceptance of an option, or an offer to sell, the acceptance must be unconditional. There must be no new terms imposed, and no departure from those offered. 'If to the acceptance a condition be affixed, or any modification or change in the offer be requested, by the party to whom the offer is made, this, in law, constitutes a rejection of the offer.'" James v. Darby, 100 Fed. 224, 228, 40 C. C. A. 341, 345, citing Weaver v. Burr, 31 W. Va. 736, 8 S. E. 743, 3 L. R. A. 94; Kelsey v. Crowther, 162 U. S. 404, 16 Sup. Ct. 808, 40 L. Ed. 1017, and other cases. To the same effect are Eliason v. Henshaw, 4 Wheat. 225, 229, 4 L. Ed. 556; Minneapolis & St. L. Ry. Co v. Columbus Rolling Mill, 119 U. S. 149, 151, 7 Sup. Ct. 168, 30 L. Ed. 376; United States v. P. J. Carlin Const. Co., 224 Fed. 859, 865, 138 C. C. A. 449; Steele v. Bond, 32 Minn. 14, 18 N. W. 830; Sanderson v. Bishop (C. C.) 262 Fed. 228. Where there was an option to purchase on the condition precedent that the prospective purchaser should pay the price specified within 90 days, and within the 90 days he gave notice that he accepted the offer and would pay within the time, it was held that the notice

was ineffectual, and that nothing but the payment of the money within the 90 days would consummate a contract of purchase. Trogden v. Williams, 144 N. C. 192, 56 S. E. 865, 868, 10 L. R. A. (N. S.) 867; Weaver v. Burr, 31 W. Va. 736, 8 S. E. 743, 747, 3 L. R. A. 94.

[3] An acceptance of an option to purchase must be such a compliance with the condition as to bind both parties, and if it fails so to do it binds neither. U. S. Gypsum Co. v. Mackey Wall Plaster Co. (9 C. C. A.) 252 Fed. 397, 400, 164 C. C. A. 321. It cannot be that the wrongful cutting and removing by the defendants of some of the trees and timber from the 640 acres of land, months before the expiration of the time allowed by the contract for the payment of the purchase price of the 640 acres of timber, bound the plaintiffs to convey that timber in the absence of the payment of the price to them. In Clarno v. Grayson, 30 Or. 111, 46 Pac. 426, 436, the plaintiff, who was the owner and lessor of a mine, which was rightfully in the possession of the lessee who held the option to purchase it under a condition precedent that he should pay $45,000 on or before a certain day, wrongfully took the possession of the mine from the lessee before the time to make the payment under the option expired. But the court held that this wrongful taking did not consummate the contract of sale or an acceptance of the option, and that the payment of the $45,000 by the holder of the option within the time prescribed was indispensable to accomplish that result. We cannot sustain the portion of the charge of the court that is here challenged. It was substantially prejudicial to the defendants and it necessitates a new trial of this case.

[4] Defendants also assign as error this portion of the court's charge: "It appears from the evidence that in the correspondence between plaintiffs and defendants, on November 28, 1921, one of the plaintiffs, Mrs. J. C. Lareau, in a letter to E. W. Crancer, one of the defendants herein, used this language, 'We consider the contract embraces the timber on the whole tract as it has been managed,' and that on December 2, 1921, said E. W. Crancer, one of the defendants, replied to other matters and things mentioned in said letter, but made no reference to the above statement by plaintiff as to the contract embracing all the timber. Now you may take into consideration the fact that defendants, after being informed of plaintiffs' understanding, did not dispute or deny any understanding at that time in his reply of December 2d."

These letters were introduced in evidence by the plaintiffs to prove that by them the plaintiffs, prior to May 12, 1922, the day on which the plaintiffs commenced this action, had made an absolute sale of the timber on the 640 acres of land to the defendants and the latter had agreed to pay $4,800 therefor on or before May 12, 1922, the day on which this action was commenced. On no other theory can the plaintiffs' first cause of action be maintained. It is based on the proposition that when the action was brought the defendants had received from the plaintiffs the title and possession of the growing timber on the 640 acres, and had made an absolute agreement to pay for it prior to the time this action was commenced. Were these letters competent evidence for the consideration of the jury upon the question whether the plaintiffs had conveyed or had absolutely contracted to convey this growing timber to the defendants, and the defendants had agreed to pay $4,800 for it before May 12, 1922?

By the written contract of September 14, 1920, the plaintiffs, the owners of the 640 acres of timber, agreed to give the defendants the option to buy the growing timber, on the condition precedent that they should pay $4,800 for it on or before October 15, 1922, and the defendants were not bound before that date to buy or pay for any of it. By the laws of Missouri these growing trees were a part of the realty. "The title to them lies in grant and must be transferred by the formalities essential to a conveyance of land. * * * As the trees were part of the realty, the statute of frauds required a memorandum of the sale of them to be signed by the owner or an agent who held written authority from the owner." Lead Co. v. White, 106 Mo. App. 222, 230, 80 S. W. 356, 358, and cases there cited; 1 Rev. St. Mo. 1909, § 2783.

We turn to the letters. On November 25, 1921, E. W Crancer, one of the defendants, wrote a letter to Mrs. Adelaide Lareau, one of the plaintiffs. At that time the defendants were cutting and removing the timber upon the 1,000 acres which they had agreed to take and pay $7,500 for. He wrote Mrs. Lareau that during the past year it had been most uphill work disposing of the defendants' product, that from the present outlook the next six or eight months were going to be equally as bad, and that "we are not asking for an extension of time on payment due

you, but we would like very much to have you extend the time for consummation of the work thereon." On November 28, 1921, Mrs. Lareau answered: "Your desire for an extension of time for clearing the timber from the land under the circumstances I think perfectly reasonable. We consider the contract embraces the timber on the whole tract as it has been managed, and perhaps an additional three years may be needed." On December 2, 1921, Mr. Crancer replied to Mrs. Lareau that he thanked her very much for the three years' extension of the contract which she gave them, and that she might rest assured that, if it was possible to clear this up sooner than the time mentioned, it was their purpose to do so. The defendants testified that they never thought or suspected that Mrs. Lareau meant by the sentence quoted, "We consider the contract embraces the timber on the whole tract as it has been managed," that she or they had in any way changed or would change the option contract as to the 640 acres of timber until Mr. Crancer about the 1st of May, 1922, received a letter from Mrs. Lareau's attorneys, in which they claimed that the defendants, by cutting trees and timber on the 640 acres, and by making no reply to the sentence last quoted from Mrs. Lareau's letter, had made an absolute contract to take and pay before May 12, 1922, $4,800 for the timber on the 640 acres of land.

Because the rights of these parties in and to the growing timber on the 640 acres under the contract for the option could not be lawfully changed into their rights under the absolute contract of sale, which the plaintiffs claim they now have, without an agreement in writing signed by the party to be charged therewith, or by some other person lawfully authorized, and no such agreement was ever made or signed by any of the parties (1 Rev. St. Mo. 1909, § 2783), and because there is no substantial evidence that the minds of the plaintiffs and the minds of the defendants ever met prior to the commencement of this action upon an agreement for such a change of their rights, or upon any definite change of those rights from their situation under the contract of September 14, 1920, these letters were not competent evidence for the consideration of the jury in this case, and it was error to instruct them that they were.

[5, 6] This conclusion has not been reached without a careful reading and consideration of all the oral testimony of the plaintiffs and of that of the defendants who were witnesses, in the light of the established rules that, where the condition precedent to an acceptance of an option to purchase is the payment of the price, verbal or written notice of an intention to accept, or of an acceptance without the actual payment of the price, does not constitute a valid acceptance or election to take advantage of the option and is futile (Trogden v. Williams, 144 N. C. 192, 56 S. E. 865, 868; Weaver v. Burr, 31 W. Va. 736, 8 S. E. 743, 747, 3 L. R. A. 94), and that parol proof of a release from a valid contract in writing regarding real estate, of a new and radically different contract concerning it, or of a radical modification of the old contract, must clearly and convincingly establish the definite terms of the new contract or of the modification of the old contract, and the fact that the minds of the parties met and agreed upon those terms at the same time.

[7] Mr. Charles D. Bell was one of the original assigns of the contract of September, 1920, and conducted the operations of the defendants and himself in cutting and removing the timber until September, 1921, when he sold his interest to the defendants, and thereafter he had no authority to act for them. From that time Mr. E. W. Crancer conducted the lumbering operations of the defendants. The written contract was made September 14, 1920. Mrs. Lareau testified that, before and after this contract was made, Mr. Bell told her and her daughter that "he undoubtedly would take the whole"; that "every time Mr. Bell talked about the land, he claimed the privilege of the option." Asked on cross-examination if, by the statement in her letter to Mr. Crancer of November 28, 1921, "We consider the contract embraces the whole tract as it has been managed," she meant that she was giving the defendants the right to clear the timber on the land, on the whole land, for a period of three years, she answered, "No; I don't think I did." Asked if she did not know then that he (Crancer) was going to take the whole tract, she answered, "Well, I knew that, by cutting all over it, he had taken the option he had asked for." Asked if, in the discussion with Mr. Bell, anything was said about when the money for the 640 acres should be paid, she evaded the question and answered that Mr. Bell offered to buy her interest in the timber, but she did not want to sell to him. Asked, "But it was your intention to give them three years additional time in which to perform?" she answered, "If he took the option, and went on with the work."

She further testified: "I understood that they were going to cut the 1,000 acres, but Mr. Bell said—I asked him when he wanted that extension when he made the agreement. I said, 'Why not take the whole,' and he said he wasn't prepared to take the whole, but he wanted an option on it, and every time we saw him he reiterated he should accept this option, and he would undoubtedly take the whole land."

Miss Lareau, the other plaintiff, speaking of Mr. Bell, testified:

"Q. Now, while he was in charge of the business for them what did he say, if anything, about taking the timber on the whole tract? A. He assured us over and over again that he would take it. * * *

"Q. Did you understand at that time that they elected to take it all? A. Yes."

On the other hand, Mr. Bell testified that he heard the testimony of Mrs. Lareau; that he told her, when the written contract was made in September, 1920, and again about the time he sold out in September, 1921, that if the conditions would justify it, or that in case the lumber business remained or continued so as to justify it, they would probably take the entire acreage of timber; but that he never told her anything further than that, and that nothing was ever said by either of them as to when the purchase price for the 640 acres should be paid, and that he never contemplated or intended his conversations to make any change in the written contract.

All the material testimony relative to conversations between the plaintiffs and Mr. Bell has now been recited, and it utterly fails to prove that the minds of the plaintiffs and Mr. Bell ever met or agreed upon any new contract, any modification of the old contract about the 640 acres, or any other method of accepting the option than the payment stipulated in the written contract. On the other hand, it establishes nothing but the fact that their minds never met or agreed upon any definite terms of modification or of change of the written contract or condition precedent to the acceptance of the option.

We turn to the testimony relative to the conversations between the plaintiffs and Mr. Crancer. Mrs. Lareau testified that Mr. Crancer came to her, and told her he thought the proposition was good; that the timber was yielding well, and the prospect of lumber was increasing in value, and he thought it was a good proposition. Asked if it was not a fact that, on account of the cutting of the timber on the 640 acres by the defendants, she considered the three letters of November and December, 1921, the grounds on which she was entitled to hold the defendants on this matter, she answered:

"I don't know that I considered anything, only just as I have written it there, that they were, under the circumstances, to go on and do the work as they had agreed to on the start. He asked an option, and he undoubtedly told me repeatedly that he would take the whole tract.

"Q. And was your intention then to give them three years' additional time on this option contract? A. Well, if they took more time to cut it, I would give him this time; but I expected the same terms followed up.

"Q. You expected the same terms followed up with reference to the payments they were to make? A. Yes.

"Q. Did you expect them to pay you $750 for each 100 acres they cut over? A. I didn't expect anything, only just to agree with the contract. It wasn't 100 acres, but it was 1,000 acres; and when he wrote that letter to me, saying that this was the last payment, there was 640 acres that had been cut over, that the best timber had been taken, and no payment. * * *

"Q. And you stand on giving him his three years' additional time in which to cut the timber on the land? A. That is, if he makes payments, and does the work according to the agreement.

"Q. What is you understanding about when this 640 acres is to be paid for according to the contract which you made with him in these letters? A. The way things have turned out, I think I, will have him pay in advance. * * *

"Q. And you never have had any agreement as to the time when the payment of the additional 640 acres is to be made? A. Mr. Bell told me that he should take the balance, and he asked an option at $7.50 an acre on the balance.

"Q. Did you understand from this that you were to be paid $7.50 an acre before this option was exercised, or was it $7.50 an acre and just let them go ahead and cut the timber and pay you afterwards? A. Oh, no; I expected my pay—

"Q. After they cut it? A. No.

"Q. Before they cut it? A. No; I expected my pay every 60 days."

Mr. Crancer testified that, when he received and answered Mrs. Lareau's letter of November 28, 1921, he had no notice or knowledge that the defendants had cut or taken

any timber or ties from the 640 acres; that he did not know what she meant by her statement in that letter, "We consider the contract embraces the timber on the whole tract as it has been managed;" that he did not have any idea that his answer to that letter could be, or any intention that it should be, an election to take the 640 acres, and he did not intend it as such.

All the evidence material to the question whether or not an agreement was made between the plaintiffs and Mr. Crancer has now been recited, and this evidence also utterly fails to show that the minds of the plaintiffs and defendants ever met or agreed upon any definite terms of any new agreement, or of any modification of the old written agreement, or of any change in the condition precedent to the acceptance of the option to buy the 640 acres of timber. On the other hand, it clearly establishes the fact that their minds did not meet upon any of these matters; that they did not meet upon any other time of payment of the timber on the 640 acres, or upon any other way of accepting the option than that stated in the written contract of September, 1920.

We have carefully reviewed the testimony in this case, because it must be tried again, and because it seems plain, upon a careful study and examination of it, that in the absence of radically new and different evidence: (1) A recovery probably cannot be sustained on a cause of action on contract for the recovery of the purchase price of $4,800 for the 640 acres of timber; (2) a recovery possibly may be sustained on a cause of action in tort for the damages suffered by the plaintiffs, if any, from the cutting and removing by the defendants of the trees and timber from the 640 acres; and (3) perhaps a recovery may be had upon the cause of action for breach of contract set forth in the second cause of action in the present complaint.

Let the judgment below be reversed, and let the case be remanded to the District Court, with directions to grant a new trial.