Davis, Judge,
delivered the opinion of the conrt:
Plaintiff asks damages for violation of an alleged contract and also seeks compensation for the unlicensed use of patents which were the subject of that agreement. Since we find the contract count decisive, we summarize only the events of significance for that aspect of the suit, leaving to the findings the intricacies of the patents and the asserted infringements. Only the issue of liability is now before us.
In the early 1950’s, plaintiff and defendant were both interested in the packaging of unassembled fire-bombs — the napalm bombs carried by aircraft for dropping against enemy targets. The contractors who furnished the bombs also supplied the packages; initially, this packaging came in various forms which were accepted so long as they complied with Government tests and obtained Government approval. Not satisfied with the types of packaging which were being used, the defendant’s experts independently attempted to design a suitable package. This research was accelerated in 1953 when it was found that bombs stored out-of-doors had become unuseable through corrosion, fungus growth, pitting, and holes in the bombs. The Chemical Corps experts then concentrated on packaging which would withstand long-term outdoor storage. As a result, the Corps developed a closed package (called the “Chemical Corps package”) with thick, heavy plywood inner blocking members.
During this period, plaintiff and its president, Harry Lankford,[1] were steadily engaged in such packaging research and development. In 1953 plaintiff made a major effort to solve problems caused by out-of-doors storage, constructing and utilizing a special “rain room” to duplicate actual *372 weather phenomena. The result of this experimentation was the Padbloc 12001 package — which used a softer, but more resistant, packaging material than the Chemical Corps package, as well as a special type of ventilation. The 12001 container appeared in useable form in November 1953 and successfully passed, in 1953 and 1954, rough-handling and rain tests by the Chemical Corps. Patent applications for certain features of the unit were filed in 1951 and 1954.
Late in 1953, Lankford sought to interest the defendant in authorizing its fire-bomb contractors to supply the new Padbloc package. Government representatives visited plaintiff’s “rain room”, observed its tests, and discussed the possibility of having the 12001 unit approved as an alternate to the 1953 Chemical Corps package. Plaintiff prepared and delivered to the defendant, at the beginning of 1954, a report on its package, with a note that the disclosure was confidential and solely to obtain approval of the product. There is no doubt that at this time the Government desired unlimited use of plaintiff’s drawings and data — i.e., the Pad-bloc 12001 package — -for its fire-bomb procurement, and that plaintiff wanted to receive sufficient compensation for its package development. Further conferences were held in efforts to reach an understanding.
The critical meeting was in New York at the end of May 1954. After three days of discussion a letter, dated May 28th, was drawn up in fifteen numbered paragraphs, addressed to the Chemical Corps contracting officer and signed by plaintiff (through Mr. Lankford). See finding 20. Although not signed on behalf of the defendant, the document reflected the demands of both the defendant and the plaintiff. It was typed in the New York Chemical Corps office and delivered there to the contracting officer. The gist of the paper was that (a) if the Chemical Corps designated the 12001 package as the only approved alternate to the 1953 Chemical Corps package on future procurements of fire-bombs, plaintiff would supply defendant with drawings, specifications and “know-how” for inspection purposes; (b) effective upon the delivery of 104,000 packaged fire-bombs to defendant or 90 days after the award of a contract for that number of packaged fire-bombs — whether or not the 12001 package was *373 actually purchased or utilized by the fire-bomb contractor— plaintiff would grant defendant a royalty-free license under its patents and “know-how”; and (c) this offer by Padbloc was to be irrevocable if the Government would amend, on or before June 15th, a certain pre-existing invitation for bids for 73,944 bombs, so as to include 12001 as the alternate container.
Almost immediately, the Government amended the existing bid-invitation to designate plaintiff’s package as the approved alternate unit, and on June 7, 1954, the contracting officer wrote plaintiff asking, in accordance with the May 28th letter, for power to inspect plaintiff’s pending patent applications on the package and for all the other material promised. Plaintiff supplied this authority and information promptly. By these communications plaintiff fulfilled all of its promises, except for the grant of the royalty-free license which was to come after the procurement of 104,000 bombs.
About a week later, the Chemical Corps tested both the 1953 Chemical Corps package and the Padbloc 12001 package. The former did not meet the defendant’s performance requirements, while plaintiff’s did. It thus became clear that for the future the 12001 unit would have to be supplied for all fire-bomb purchases. It was by far the preferable packaging.
What defendant then did was to have plaintiff’s drawings copied and given to the fire-bomb contractors who reproduced them for their own purposes. Other information obtained from plaintiff was also sent to these contractors who then made, or had made, packages like plaintiff’s but which were not procured from plaintiff or its licensees.[2] The obvious result of defendant’s actions was that the contractors, in order to fulfill the packaging requirements, would not need to purchase 12001 units from or through plaintiff, but could do the manufacturing themselves or through their own subcontractors. This was made explicit in a letter of October 5, 1954, from the Chemical Corps to plaintiff, saying that it had been decided that the best interests of the Government *374 no longer dictated the direct purchase of Padbloc containers from plaintiff.
In response to this and like communications, plaintiff informed the defendant that “the written agreement” of May 28th was no longer in effect and the Government was not entitled to a royalty-free license. This closed the history of the parties’ consensual relationships and laid the foundation for this suit.
Plaintiff’s position is that, until defendant had contracted for 104,000 bombs for which Padbloc 12001 was an approved alternate packaging, defendant was bound to use plaintiff’s patent-applications, drawings, and technical “know-how” only for the purposes of inspecting the 12001 packages (purchased from or through plaintiff) which were submitted to it by fire-bomb contractors in compliance with procurement contracts designating plaintiff’s package as the approved alternate; until that time, defendant was bound not to make the plaintiff’s information and drawings available to others who could make a unit similar to plaintiff’s. Defendant’s rebuttal is that the Government was bound to do nothing under the May 28th document, which was simply a letter from plaintiff; that the Government made no promises of any kind; and that the Government was the mere passive recipient of an offer by plaintiff and could therefore take any action it thought desirable without breaking any stipulation or agreement.
If for the moment one pushes to the back of the mind all the traditional detailed learning on unilateral and bilateral contracts, it becomes evident what the parties were driving at and what their arrangement was. Padbloc had developed, by research and experimentation, a bomb container which it had good reason to believe would be satisfactory — indeed, preferable — to the Chemical Corps. It had applied for- patents on certain aspects of its package and sought to keep confidential its drawings, “know-how,” and other technical information. Quite naturally, it wished to benefit from its work and its conception, which it deemed novel. The Government was reluctant to adopt this patented design as mandatory. But if it could be induced to give its specific approval to the Padbloc package on a *375 large procurement, even as an alternate to another design, enough producers of fire-bombs would likely choose plaintiff’s unit (which could be procured only from plaintiff) to bring forth an adequate monetary return. The Government was to be persuaded to give this imprimatur by the promise that, if it approved the Padbloc container for 104,000 bombs (a large enough procurement), it would then obtain a royalty-free license for the future. But the Government was not to be bound to approve the Padbloc unit or to designate it for 104,000 bombs (or of any number); it was to be free to decide whether its interests and policy called for such action.
In this sensible plan there were two potential gaps which had to be closed. The Government could not wait until it received its royalty-free license before it saw plaintiff’s drawings and material; it would need them much sooner in order to check on the Padbloc containers furnished by the bomb contractors under the procurement of the first 104,000 bombs. In addition, the defendant would want to be protected against the plaintiff’s revoking its offer of a royalty-free license after the Government had designated the 12001 package for a substantial procurement but before the crucial number of 104,000 had been reached. The solution to these two problems was (i) to provide the defendant with plaintiff’s drawings and information, “for inspection purposes” only, as soon as the Padbloc container was included in any substantial procurement, and (ii) to make the plaintiff’s offer of a royalty-free license irrevocable if the Government shortly amended a substantial outstanding purchase-offer to designate the Padbloc container.
For Padbloc, this plan would be quite acceptable. It took its chance that the defendant would not order its container for a sufficiently large procurement, but it could count on merit to evoke that election by the Government. Other than that, plaintiff took no disastrous risks — unless the defendant would be free, as it now insists, to use plaintiff’s drawings and information, as soon as supplied and before 104,000 bombs were ordered, for general procurement purposes and not merely for inspection. In that event, the bomb contractors would not have to deal with plaintiff; they could make *376 tbeir own containers or buy them from others. Moreover, the confidential information could become available to the world. Plaintiff’s greatest asset, secrecy, would be dissipated forever; this would be particularly injurious for those of plaintiff’s technical secrets which were not patentable. By defendant’s choice, plaintiff’s entire position in the bomb-container field could be undermined permanently. It is almost inconceivable that plaintiff, a business enterprise interested in its own survival, would have made its offer of May 28th, or entered into the plan at all, if it thought that the defendant would be free to take such action as soon as it received the drawings. Plaintiff must have thought, and reasonably so, that the price of the Government’s use of the confidential information for general procurement purposes would be approval of the 12001 package for 104,000 bombs; even then, the Government would obtain a royalty-free license but those beyond the circle of federal procurement would not become privy to plaintiff’s trade secrets.
For the Government, the arrangement plaintiff had in mind would also be satisfactory. The Chemical Corps was free to designate the 12001 package, or not; and the designation could be for less or more than 104,000 bombs. If the latter figure were reached, the Government would obtain the distinct advantage of a royalty-free license for the future; and the plaintiff could not revoke its offer of a free license once the defendant had designated the package for a substantial procurement; the decision to reach 104,000, or not, would then be wholly the defendant’s. The only bond fettering the defendant would be that it could not use the drawings, etc. for general procurement purposes unless and until it decided to list plaintiff’s product for the full 104,000 bombs. This is a reasonable plan in which the defendant could readily join without carping. On the other hand, although it would doubtless be pleasant for defendant if it were not bound in any way — no matter what the detriment to plaintiff — it could not expect the plaintiff to make an offer or adhere to an arrangement which gave the United States carte blanche. “We are not to suppose that one party was to be placed at the mercy of the other” (Wood v. Lucy, Lady *377 Duff-Gordon, 222 N.Y. 88, 118 N.E. 214 (1917)). From its careful and protracted negotiations with plaintiff, defendant must have sensed that this company was not a business eccentric willing to put its whole trust in faith alone.
This is the commonsense and realistic shape of the parties’ transaction. Will it fit into an acceptable legal mold? This is not to be measured by state law (the parties seem to think that New York law controls) but by the uniform federal “common law” which governs the contracts of the United States. See United States v. Allegheny County, 322 U.S. 174, 183 (1944); S.R.A., Inc. v. Minnesota, 327 U.S. 558, 564 (1946); Kern-Limerick, Inc. v. Scurlock, 347 U.S. 110, 121-22 (1954); United States v. Jones, 176 F. 2d 278, 281 (C.A. 9, 1949); United States v. Latrobe Construction Co., 246 F. 2d 357, 362-63 (C.A. 8, 1957); United States v. View Crest Garden Apts., Inc., 268 F. 2d 380, 382 (C.A. 9, 1959); Krupp v. Federal Housing Administration, 285 F. 2d 833, 834 (C.A. 1, 1961) .[3] As always, the federal contract law we apply should take account of the best in modern decision and discussion.
The threshhold question is whether the parties’ transaction was a bilateral or a unilateral contract (to use the established terminology). Defendant insists that “nothing more than a unilateral offer was contemplated” — it is said that the letter of May 28th consists of promises by plaintiff (the promisor) which would be binding on it only upon complete performance by the defendant (the promisee) of the act sought by the promisor (i.e., inclusion of the Padbloc package in the procurement of 104,000 bombs) ; and that there was no countervailing promise by the defendant. See, e.g., Petterson v. Pattberg, 248 N.Y. 86, 161 N.E. 428 (1928). Tins formulation may have an initial appeal. We know, however, that there are many situations in which the outline of the transaction appears unilateral but a return promise can fairly be implied from all the circumstances. That unstated return promise can often be seen in a docu *378 ment, ail act, or a course of conduct.[4] This is just such a case. Plaintiff had promised to make its data immediately available, for a limited end, if defendant amended an existing bid-invitation. The defendant’s letter of June 7th told plaintiff that the Chemical Corps had revised this outstanding invitation to include the Padbloc container as an approved alternate, and requested that all the promised confidential information be submitted. The basic letter of May 28th made it clear that the confidential information could be used by the defendant “for inspection purposes” only, until the full 104,000 items had been procured. For the reasons already elaborated, it is wholly appropriate (and fully in accord with reality) to read the defendant’s letter of June 7th, although it did not say so in words, as impliedly promising to abide by that provision when the information was forwarded.[5] That is certainly what plaintiff reasonably thought and what the defendant had every reason to believe the plaintiff would think. The defendant, for its part, could not reasonably assume that it would receive plaintiff’s secret data without any interim obligation to protect their secrecy. Nothing said in the letter of May 28th or the reply of June 7th negatives such an implied obligation. “Transactions of this kind must be interpreted with common sense and in accordance with the actual usages of men.” Corbin, Contracts, Sec. 70. As Judge Cardozo put it in the classic opinion for this type of case (Wood v. Lucy, Lady Duff-Gordon, 222 N.Y. 88, 118 N.E. 214 (1917)) : “A promise may be lacking and yet the whole writing may be ‘instinct with an obligation,’ *379 imperfectly expressed * * *. If that is so, there is a contract.” [6]
A long-term trend in tlie modern law of contracts supports our finding of a binding promise by defendant — not to use plaintiff’s drawings and information, for general purposes, until the required 104,000 bombs had been procured — in the plaintiff’s letter of May 28th and the Government’s response of June 7th. That trend looks toward holding, if justice so requires, one whose promissory words have induced significant action in reliance (even though there be no technical consideration in the narrow sense).[7] Feeding both that development and the parallel readiness of present-day courts to infer an unexpressed promise from the total situation is the root conception that justified expectations arising from consensual transactions should normally be satisfied by the law — particularly in business contexts. Here, as we have said, plaintiff justifiably assumed that its confidence would not be violated and that the defendant would respect the limitations clearly placed on the use of plaintiff’s drawings and other material. The contemporary rules of contract law permit that reasonable expectation to be fulfilled.
Defendant does not deny that, if there was a binding promise on its part, it breached it by broadly disseminating plaintiff’s confidential information for procurement purposes, shortly after the Government discovered that the Padbloc container appeared to be the only acceptable one for fire-bombs. Since we hold that such a binding promise existed, plaintiff is entitled to a judgment that its agreement with defendant was violated.
*380 The case must proceed before the Trial Commissioner for the determination of damages. Without laying down a rigid rule for the Commissioner and the parties, we state that it is our present view that the plaintiff is entitled to recover on the basis of full performance, by both sides, of the contract created by the letters of May 28, 1954, and June 7, 1954. That would mean that there must be determined (to the extent that such facts can reasonably be ascertained) : (a) the probable purchases (if there had been no breach) from plaintiff (or its licensees) of Padbloc units by those fire-bomb contractors supplying the first 104,000 bombs to the defendant who did not actually purchase from or through plaintiff; and (b) the plaintiff’s probable profit on such frustrated purchases. This latter sum would represent plaintiff’s damages because of the contract breach. If this measure of loss is not feasible, some other appropriate standard will have to be used. But in any event plaintiff would not recover anything for use by or through the Government of plaintiff’s drawings, patents, and other information after the first 104,000 bombs were procured; at that stage the Government would have been entitled to a royalty-free license.
As we understand the opposing contentions and the record, it is unnecessary, in view of our ruling on the contract claim, to consider the patent infringement claim. The patents involved in the latter count are included in the contract aspect of this action. With respect to the first 104,000 fire-bombs, plaintiff will be compensated under the contract claim, whether or not its patents are valid or were infringed. For any remaining containers, the United States would be entitled to a royalty-free license, now that such compensation is to be awarded, and the plaintiff could not recover for any such further use, even if it is assumed that the patents are valid and would have been infringed (absent a license). We therefore need not and do not pass upon the validity of the patents or the claimed infringements.
Plaintiff is entitled to recover on its contract claim, and judgment is entered to that effect. The amount of recovery will be determined pursuant to Rule 38 (c).
*381 The court, having considered the evidence, the report of Trial Commissioner Donald E. Lane, and the briefs and argument of counsel, makes findings of fact as follows:
1. The plaintiff sues under Title 28 U.S.C. § 14-91, for damages for an alleged breach of contract by the United States. The plaintiff also seeks judgment for reasonable and entire compensation under Title 28 U.S.C. § 1498, for the unlicensed use of inventions described in and covered by three United States Letters Patent. Counsel for the parties agreed to a separation of issues for trial, limiting the initial trial to the issues relating to the right of plaintiff to recover, reserving the determination of the amount of recovery, if any, for further proceedings.
2. The plaintiff is a privately owned corporation organized under the laws of the State of Kansas in 1951. It is a closely held corporation in which the majority of the issued and outstanding stock is held by Harry G. Lankford. Lank-ford has held the office of president of the plaintiff corporation without interruption since it was organized, and is named as the inventor in each of the three patents in suit. Lankford was employed by Cessna Aircraft Company during World War II as head of the experimental department of that company, concerned with constructing and testing military type aircraft and aircraft structures. Lankford went into the packaging business in 1951, initially doing business as the Structural Padbloc Company, and then as The Pad-bloc Company, a proprietorship. This proprietorship was merged into plaintiff corporation in May 1952. The plaintiff corporation shall hereinafter be referred to as Padbloc to distinguish it from the two predecessor companies. Pad-bloc has been engaged in the packaging business from May 1952 throughout the pertinent periods involved in this litigation. Padbloc has its principal place of business at Wichita, Kansas, with other points of operation in Los Angeles, California, and Chicago, Illinois.
GENERAL DEVELOPMENT
3. This action relates to the packaging of articles such as fire bombs, having a generally cylindrical hollow center sec *382 tion and cone-shaped or frusto-conoidal streamlined end sections which are also hollow. The parts of the 750-pound fire bombs are usually packaged disassembled. In the late 1940’s the fire bomb was first procured by defendant as a manufactured unit with streamline or airfoil shape. The fire bomb has been known by the designation E74 (series) or M116 (series). When fully assembled, the fire bombs here involved were approximately 20" in greatest diameter and approximately 10-12' in length. The weight of the fire bomb parts is approximately 78 pounds. The exterior skin of the fire bomb is of thin aluminum sheet.
4. - After 1950 the generally external shape of the fire bomb did not change materially, but substantial changes were made in the manner of assembling the three sections. The Martin bomb and the Fletcher bomb procured in 1950 and 1951 utilized a long slender steel tie rod to hold the three fire bomb sections together. This tie rod was packaged separately in a box in the fire bomb package and was withdrawn from the tie rod box and put in place in the bomb at the time of assembling. During the years 1951 and 1952 a different method was used to assemble the fire bomb whereby the center section of the bomb had threaded stud bolts protruding from each end of the center section which were inserted into holes in the base ends of the conoidal nose and tail sections. Nuts were affixed and tightened onto the stud bolts by the assembler, thereby pulling the nose and tail sections of the bomb into contact with the center section. This method of assembly was used until the spring of 1953, and required assembly personnel to insert hands through holes into the interior of the bomb to affix the nuts on the stud bolts, affixing the nuts primarily by the sense of touch. To avoid this, the Chemical Corps, United States Army, in 1953, held up production of a fire bomb contract awarded to Diamond Building Products Corporation for the purpose of developing changes in this method of assembly, so that the bomb could be assembled wholly from outside the bomb by means of a clamp arrangement. The clamp method of assembly was specified by the Chemical Corps in an Invitation for Bid issued in May 1954. In December 1953 and up to July 15, 1954, these clamps, 16 in number, were to be packaged in a *383 separate kit bos within the fire bomb package. Later, during 1954, the Chemical Corps used a redesigned clamp which employed a spring to hold the clamp on the bomb section during shipment. This clamp was of lesser weight and embodied special design changes. The adoption of the redesigned clamp assembly in 1954 is involved in both the contract count and the patent count in this lawsuit.
5. In 1950 The Glenn L. Martin Company delivered a small test load of fire bombs and fire bomb containers to the Chemical Corps for testing. This Martin container housed two disassembled fire bombs in tandem and was entirely closed. It also had a center plywood member between the bombs. The three sections of each Martin bomb were held rigidly together in the container by a bolt having the shape of the letter “J”. Shortly after the Martin package was tested, Mr. Simpers, a Government employee with the packaging research section of the Chemical Warfare Laboratory, designed and tested several fire bomb packages utilizing an open crate, flat steel strapping above and a wooden saddle below the bomb section, and a “J” bolt to hold the sections together. This Simpers package was never used and was canceled by governmental action.
6. In the fall of 1950, the Corps of Engineers expressed an interest in fiberboard for making the external members of packing boxes. In the latter part of 1950 Herbert Austin produced items such as external boxes for ammunition, pallets, and grain bins, using a fiberboard, commonly known in the building industry as Celotex, rigidified by impregnating it externally with plastic materials. Austin testified he made no claim to having used this material for internal blocking members in packaging, and made no claim to having the concept of or using this fiberboard material without impregnation in packaging applications.
7. In 1951, Fletcher Aviation Corporation designed and produced for the United States Air Force a fire bomb and fire bomb package. This package consisted of a closed wooden box providing for the packaging of two fire bombs side by side. This Fletcher package used no saddles, cradles, blocking members, or interior panels to hold the disassembled bomb in place. The bomb was cushioned at various points *384 by a soft, pliable, highly compressible material. The assembly of the bomb sections into the Fletcher package was not as complicated as with the Simpers package but required considerable care in taping and retaping the cushioning material.
8. In 1951 Beech Aircraft Corporation supplied the U.S. Air Force with disassembled fire bombs and fire bomb packaging. The Beech package consisted of a wire-bound wraparound type of exterior box, wholly closed, and the interior packaging parts were numerous. One end section of the Beech bomb was nested within the other end section, and the center section of the bomb was packed below the end sections. This package utilized steel strapping to hold the bomb sections on wooden saddles and used sponge-type rubberized hair and a pliable cushioning material between the straps and the bomb sections and between the bomb sections and the wooden saddles. The fire bomb unit within the Beech package was held in place solely by the tension of the steel strapping. A vapor-proof paper bag enclosed the entire packaged unit, and movement of the bomb caused holes to be worn in the bag on occasion. The package had red arrows on the exterior to indicate that the packages were to be handled so that the red arrows pointed upwardly.
9. During the production on the Beech fire bomb contract, Beech purchased from Lankford parts for fire bomb packaging. This Lankford package used the Beech wire-bound outer cover, and the interior consisted of only a few interior packaging members made of fiberboard, such as “Celotex”, commonly used in the construction industry for wallboard and roof insulation. As packaged, the outer ends of the two conoidal bomb sections and the center section were positioned within recesses cut or routed in the fiberboard pieces to the shape of the bomb section to be received, and the two nested conoidal bomb sections were separated by a ring of fiberboard material between the two sections. The perimeters of the two end packaging members were completely in contact with the interior of the wrap-around cover. The Lankford package was tested by Beech early in 1951 and was approved by the U.S. Air Force.
10. In 1952 Lankford made and sold the interior fiber *385 board blocking or packaging members of a fire bomb package to the American Stove Company, later known as Magic Chef. These interior packaging members structurally accomplished the same purpose in the same manner as those of the packaging which Lankford supplied Beech. End and inner packaging or blocking members were used, the bomb being nested with the conoidal bomb sections inserted in the opposite ends of the center bomb section. The inner packaging member had means therein to mount and support the end of the center bomb section, and a centrally located, formed aperture through which the apex end portion of the conoidal bomb section was inserted to place the inner packaging member between the bomb sections spacing them. The base end or rim of the conoidal bomb section rested in a recess or groove in the end packaging or blocking member. The same arrangement existed at the other end of the package. The perimeter of all of these interior packaging members was completely in contact with the interior of the external container or outer cover which consisted of four separate wrap-around panels and two end panels. The interior blocking members were made of a rigid, industrial-type fiberboard.
11. In the spring of 1953 the Chemical Corps started development work on a fire bomb package for long-term, outdoor storage. The first package adopted by the Chemical Corps in 1953 consisted of a wholly closed standard type external container with thick, heavy, 4-ply plywood inner blocking members. The Beech and Magic Chef bomb packages did not stand up under long-term storage outdoors, as evidenced by the corrosion, fungus growth, pitting, and holes found in quantities of bombs stored at a West Coast air base. This problem of outdoor storage became evident to the defendant during 1953.
PADBLOC DEVELOPMENT
12. Starting in 1951, Lankford, and subsequently Padbloc, used fiberboard, such as Celotex, for interior blocking members in packages. In 1951, Lankford supplied Cessna Aircraft Company with interior blocking members for packaging aluminum aircraft components such as rudders and ele *386 vators. The low cost of this fiberboard material, as compared with the cost of other available packaging materials, caused Lankford to work for its utilization. When used as a packaging material in contact with aluminum surfaces, industrial fiberboard should have a composition of ingredients providing for a pH value, when wet, in the range of 6.5 to 7.5 to provide chemical neutrality and to prevent corrosive damage to the aluminum surfaces. The fiberboard should also have certain characteristics of wet strength, impact resistance, and cushioning value. In the absence of fiberboard having the needed characteristics in 1950 or 1951, Lankford began formulating specifications in 1951 and continued into 1954 making up such specifications as an officer of the plaintiff corporation. Fungistatic requirements were added in 1953 and 1954. The last specification for this fiberboard material formulated by Padbloc is involved in the action for breach of contract herein. Plaintiff claims that this Pad-bloc specification was delivered to the defendant in performance of a contract with the defendant, and that the defendant distributed the specification to manufacturers of fire bomb packaging in breach of the contract.
13. In an effort to seek the cause and solution of corrosion and fungus problems, Padbloc, under the supervision of Lankford, constructed a special test room in Wichita, Kansas. This “rain room” was equipped to duplicate actual weather phenomena involving temperature, air movement, rain, and humidity, automatically controlled to produce a given set of weather conditions. Package testing was conducted in the Padbloc rain room during July and August 1953. Many types of containers were tested in this program, as well as many types of interior blocking members. Lank-ford developed a package known as the Padbloc Catalog No. 12001 package. Lankford formulated a purchase description for the fiberboard blocking material to meet the desired requirements, and the description was designated Material Specification 9154A. Fiberboard material known as Padex 9154A was used in the 12001 package. Plaintiff’s physical exhibit 96 is an actual size inner blocking member made of material meeting the requirements of Material Specification 9154A as used in the Padbloc Catalog No. 12001 package.
*387 14. In providing a package that would shed water off the exterior surfaces, the 12001 package was constructed so that the top panel overlapped the side and end panels, and the side and end panels overlapped the bottom of the package. Since all the water or moist air could not be kept out of the package, ventilation to minimize condensation within the package was achieved by providing the package with a slatted bottom having a maximum opening on the package bottom consistent with necessary structural strength. The 12001 package accomplished ventilation without requiring any apertures in the upper part of the container. The bottom of the package comprised three longitudinal slats having three crosswise skids providing for positive ventilation when the packages were stacked on top of one another. The blocking members within the package were held in place by cleats secured to the bottom, sides, and top of the container, and external vertical cleats were provided on the sides of the package and nailed through the side to the interior cleats. The Padbloc 12001 package could be handled or shipped with any side or end upward and was made to accommodate the Beech fire bomb as early as November 1953.
15. In 1953 and in 1954 the Padbloc 12001 package was subjected to rough-handling tests and to a rain test by the Chemical Corps. The package successfully passed the tests on each occasion.
16. In late 1953, Lankford began developing a spring-loaded clamp assembly to facilitate the assembly of bomb sections in the field to form a fire bomb. Lankford developed a lightweight clamp which could be placed in position on the disassembled fire bomb at the factory at the time of manufacture. This clamp utilized spring means to correctly position the clamps and to prevent vibration thereof during transit. Padbloc, under Lankford’s supervision, conducted tests on various types of clamps and springs during the latter part of 1953, and by December 29,1953, Lankford had developed a clamp and spring assembly that did not have to be separately packaged and handled in the field. The clamp spring assembly in its manufactured embodiment consisted of a clamp made by cold forging, a combination washer, and O-ring for sealing presses, a bolt, and a leaf spring.
*388 17. Id. late 1953, Lankford visited Government officials at the New York Chemical Procurement District and at the engineering agency of the Chemical Corps at Baltimore, Maryland. Here he learned that the blocking members in a fire bomb package procured from Magic Chef had become soft and mushy when submerged overnight in water. Lank-ford advised Chemical Corps personnel that Padbloc had developed an improved type of fiberboard material that was more resistant to moisture, stronger, and more resistant to fungus, as described in Padbloc Material Specification 9154A, for outdoor, long-term storage. Lankford also advised that there would be a saving to the Government if contractors were permitted to supply the Padbloc long-term storage package as distinguished from containers using plywood blocking members. Chemical Corps personnel went to Wichita, Kansas, on December 2, 1953, and observed the Padbloc rain room and the results of Padbloc testing of containers and blocking materials. While there, they observed the testing of the Padbloc 12001 package. The possibility of having this package approved as an alternate to the 1953 Chemical Corps package was discussed. A descriptive report on the Padbloc 12001 package was completed and delivered to the Chemical Corps at Balitmore early in the year 1954. The preface page of this report stated as follows.
PREFACE
Padbloc package No. 12001 is presented as an alternate package design for the Army Chemical Corps 750 pound fire bomb. Since this package embodies proprietary items and is therefore available from limited sources, it is requested that contractors be granted authority to use either the Chemical Corps package as specifically detailed on Chemical Corps Drawing No. D14-17-647 and available from many sources, or Padbloc package No. 12001 available only from The Padbloc Company, Wichita, Kansas, or its authorized licensees.
The following data is presented in support of this request.
NOTICE OF CONFIDENTIAL DISCLOSURE
The methods, ideas, materials, designs, uses, processes, arrangements and structures of packaging disclosed herein are the subject of matters of patent applications pending.
*389 Any disclosure made herein to the Chemical Corps, U.S. Army is a confidential disclosure to Chemical Corps personnel only for the sole purpose of procuring approval of the product.
18. The Padbloc Report No. 12001, plaintiff’s exhibit 2, having the quoted preface, illustrates and describes Padbloc packages, and describes particularly the details of the Pad-bloc 12001 package and the testing thereof. One of the several drawings therein illustrating the Padbloc package No. 12001 is reproduced at the end of these findings, appendix A. The drawings contained in the Report, pertaining to the internal blocking members and external parts of the No. 12001 package, had printed or typed thereon a notice of confidential disclosure comparable to that set forth in finding 17.
19. On January 20, 1954, Lankford met with Chemical Corps personnel and Diamond Building Products Corporation personnel in Cleveland, Ohio. He exhibited to the group an actual fire bomb clamp assembly and a drawing showing in pictorial form the use of the clamp. A portion of the clamp assembly drawing is reproduced at the end of these findings, appendix B. The drawing bore the identical restrictive notice printed on the drawings contained in Report 12001.
20. Defendant approved use of the Padbloc 12001 package on 10 of 20 test bombs procured from Diamond Building Products Corporation. During March, April, and May 1954, Lankford made several trips from Wichita to New York and Baltimore to discuss the desire of the Chemical Corps to have unlimited use of Padbloc drawings and the desire of Padbloc to sell the package development. Various proposals were set forth during conferences and in correspondence between Padbloc and the Chemical Corps. Padbloc and the Chemical Corps arranged to have a meeting in New York City commencing May 26, 1954, to resolve their differences. This conference lasted three days. At the conference the Chemical Corps was represented by a contracting officer, Jesse Gershberg, and his attorney, and Padbloc was represented by its president, Lankford, and its attorney. This 3-day conference materialized in a typewritten document, signed by the president of Padbloc, and consisting of 15 numbered *390 paragraphs. The language of the document reflected the demands of both the Chemical Corps and Padbloc. The May 28, 1954, document, plaintiff’s exhibit 39, was typed by a secretary in the New York Chemical Corps office. Mr. Lank-ford signed the document at the request of Gershberg, and delivered the signed document to Gershberg. Pertinent portions of this document are quoted below.
May 28,1954.
Mr. Jesse Gershberg,
Contracting Officer,
Dear Ser: Deference is made to our conference at Materiel Command in Baltimore on 22 April 1954, relative to our proposal that the Bomb Container designated as Padbloc Company, Inc. Catalogue No. 12001, of latest revision, be made the only alternate in the Invitation for Bid or Bequest for Proposal you are presently contemplating, in accordance with advance notice for the Fire Bomb, dated 22 October 1953, and any additional invitations or requests for the same item when added to the quantity set forth in the advance notice totals 104,000 Fire Bombs, and in the event said bid has already been issued, our alternate container shall be added to said invitation or request by amendment.
As consideration to the Government for including our product as the only alternate in any invitations or requests for proposals up to a total of 104,000 Bombs, we offer the following to the Government:
1. Upon the inclusion of the Padbloc containers iu the Invitation for Bid or Bequest for Proposals mentioned above, the Padbloc Company, Inc. agrees to grant to the United States Government a royalty-free, nonexclusive license under any patent which the said corporation has at the time of the issuance of said Invitation for Bid or Bequest for Proposal, or under which in the future it may acquire the right to grant licenses insofar as such patent is employed in the making, using or disposing of said Padbloc container and/or component (where the component is tied in with the patent), and to the extent necessary to permit the making, using or. disposing of the said Padbloc container by or for the United States Government, for Fire Bomb, purposes only. The said license shall be executed by and be effective upon the delivery of 104,000 containers, from bids or requests where the Padbloc item was the alternate, to the Government or its prime contractor, whether or not *391 tbs Padbloc container is purchased or utilized by the prime contractor.
jji :j: # s¡« ‡
3. Upon the inclusion of the Padbloc container in said Invitation for Bid or a Bequest for Proposal, the Padbloc Company, Inc. will furnish the Government all of the manufacturing drawings for the Fire Bomb container and/or bomb (where the patent is tied in with the container), and the specifications for the material to be used in said container, and the details of methods of application or applications of said material for use by the Government for inspection purposes, subject to the general use permitted in paragraph “10”.
4. Upon the issuance of the license or licenses called for in paragraph numbered “1” hereof, the Padbloc Company, Inc. will execute a royalty-free, non-exclusive blanket license in any trade secret or “know-how” in which the Padbloc Company, Inc. asserts a proprietary interest, insofar as such information is employed in the making, using and selling of the Padbloc container mentioned herein, for use by the Government for Fire Bomb purposes.
5._ Upon the inclusion of the Padbloc container in the Invitation for Bid or Bequest for Proposal mentioned above, the Padbloc Company, Inc. will make available, for inspection purposes only, subject to the general use permitted in paragraph “10”, all of the data concerning any trade secret or “know-how”, in which the Padbloc Company, Inc. asserts a proprietary interest, insofar as such information is employed in the making, using and selling of the Padbloc container mentioned above.
6. In addition to the above, the Padbloc Company, Inc. warrants and guarantees both to the Government and any contractor awarded a contract and who subsequently utilizes the Padbloc container that its container will meet all applicable performance requirements set forth in Chemical Corps Directive No. 206B dated 4 October 1951.
7. In addition to the foregoing, the Padbloc Company, Inc. agrees that if it is the supplier of the container under any contract (the Padbloc Company being either the prime contractor itself or a subcontractor to another prime contractor), in which its container is set forth as an alternate in the Invitation for Bid or Bequest for Proposal, that it will limit its profit, insofar as packaging is concerned, under said contract or contracts to Ten (10%) percent of its cost (to be determined in accordance with Section XV of the Armed *392 Services Procurement Regulation in effect as of this date, as modified in paragraph 12 below), and that at the completion of the contract or contracts, subcontract or subcontracts, the Government may audit its records covering such costs. In the event a greater profit is shown, the Padbloc Company, Inc. will make a refund to the Government of any profit in excess of said Ten (10%) percent, whether the Padbloc Company was the prime contractor or subcontractor to another prime contractor.
8. Upon the inclusion of the Padbloc container as the alternate in any Invitation for Bid or Request for Proposal mentioned above, the Padbloc Company, Inc. will submit to the Chemical Corps within Ten (10) days executed powers to inspect the patent applications assigned to the Padbloc Company, Inc. now pending in the Patent Office, and which cover portions of the Padbloc Company, Inc. container bearing Catalogue No. 12001. In addition, the Padbloc Company will also forward a list of the specific structural details of its container heretofore disclosed to the United States Government, which it believes embody trade secrets and “know-how”, for which patent applications will not be filed but which it believes the Government is not entitled to use unless authorized to do so by the Padbloc Company, Inc. under this agreement.
9. The Padbloc Company agrees that the Government shall not be estopped at any time after the Government is entitled to receive the license or licenses called for herein, to contest the enforcibility, validity in, scope of, or title to any patent or patent application herein involved.
10. The Padbloc Company agrees that after the Pad-bloc Company container has been made an alternate in Invitations for Bids or Requests for Proposals or amendments to outstanding contracts calling for 104,000 Fire Bombs, and a period of at least Ninety (90) days has expired from the award of the last instrument bringing the total to 104,000 units, or November 1, 1954, whichever is the latest, that the Government may issue additional Invitations or Proposals using the Padbloc drawings and specifications, etc., as if the Government had licenses, without regard to whether the 104,000 Bombs had been delivered.
11. In the event the prime contractor of the contracts in which the container of the Padbloc Company, Inc. was named as an alternate should be terminated for default, and such default was not caused by the Padbloc Company, Inc., the Government agrees that in the re *393 purchase of the defaulted item, to include the container of the Padbloc Company, Inc. as an alternate, in the same manner as the original basic contract, unless the default of the prime contract was attributable to the Padbloc Company, Inc. If a firm other than the Pad-bloc Company did obtain a subcontract under said original contract, the Government will not be under any obligation to include the Padbloc Company, Inc. as an alternate, and upon the Government’s receipt of 104,000 containers, whether from the basic or the re-purchase contract, the Padbloc Company, Inc. will be obligated to issue the licenses called for herein.
* * * i= *
14. If the Government should amend Invitation for Bid No. CML 30-070-54-188, issued 14 May 1954, calling for 73,944 Fire Bombs, on or before June 15, 1954, including Padbloc No. 12001 as the alternate, this offer shall be irrevocable by the Padbloc Company, Inc.
15. The above offer is conditioned upon the Amendment to Bid making the Padbloc Company, Inc. container an alternate, containing the following or similar language:
“Distribution of these drawings is not to be construed as a license to operate under any patent or patents which are covered thereby.
In addition to the above, the Government’s approval of the Padbloc Company, Inc. design is not to be considered an approval of the Company’s ability to perform the packaging services called for in this bid. The successful bidder must make its own survey for all of its subcontractors and must assume complete responsibility for the performance of its subcontractors, both as to quality and delivery requirements.”
Very truly yours,
The Padbloc CompaNY, Inc.
Sgd. HaeRY G. Lankeord,
Harry G. Lankford, President.
21. The document quoted above, signed for Padbloc on May 28,1954, provides that if the Chemical Corps designated the Padbloc 12001 package as the only approved alternate package to the 1953 Chemical Corps package on future procurements, Padbloc would promptly furnish the defendant with drawings, specifications, and “know-how”, for inspection purposes only, and Padbloc would grant the defendant a royalty-free license under its patents and “know-how”, *394 effective upon the delivery of 104,000 fire bomb packages to defendant or effective 90 days after the award of a contract for said number of packaged fire bombs, whether or not the Padbloc 12001 package was purchased or utilized by the contractor. The document was not signed by or for the defendant. On June 2, 1954, the Chemical Corps amended an existing invitation for bids on fire bombs by designating the Padbloc 12001 package as an approved alternate packaging unit. On June 7, 1954, Jesse Gershberg, contracting officer, New York Chemical Procurement District, U.S. Army, wrote Padbloc as follows:
Eeference is made to your offer of May 28, 1954 pertaining to the tendering of various licenses, proprietory rights, etc. relating to The Padbloc Pack, Catalogue 12001.
In accordance with your offer, the Government has issued Amendment No. 1, dated 2 June 1954 to Bid Cml 30-070-54-188 making said offer irrevocable.
You are hereby requested to issue the necessary “power to inspect” in accordance with paragraph 8 of your offer. It is further requested that you submit all other matter to which we are entitled under the proposal.
It is contemplated that your present method of packing the Filler Caps to the Bomb sections as shown in your current drawings will be changed. It is therefore desired that you submit alternate drawings to provide for the packaging of the Filler Caps, presumably in a small carton, for review.
We confirm that files transmitted with your non-acceptable offer of 18 May 1954 have been returned by personally giving them to Mr. Lankford.
22. About May 28,1954, Lankford delivered to Gershberg a sketchy drawing of the Padbloc 12001 package including the clamp assembly. Copies of this drawing were distributed by Chemical Corps with the June 2,1954, amendment of the existing invitation for bids on fire bombs. On June 9, 1954, Padbloc sent a set of manufacturing drawings to Chemical Corps. On June 15, 1954, Padbloc delivered to Chemical Corps (1) Material Specification 9154A for the material for blocking members, (2) Specification No. T-2, for a chemical to be used on packages to prevent fungus growth and to make the package water-repellent, (3) Specification N-208 on supplemental manufacturing and assembly instructions for the *395 12001 package, and (4) authority to inspect Padbloc patent applications. On August 24, 1954, Padbloc sent additional drawings to Chemical Corps.
23. On July 1A-15, 1954, Chemical Corps tested the 1953 Chemical Corps fire bomb package and the Padbloc 12001 package at Army Chemical Center, Edgewood, Maryland. The 1953 Chemical Corps package design did not meet defendant’s anticipated performance requirements. The Pad-bloc 12001 package withstood the Chemical Corps tests. Working drawings of the 12001 package were prepared by Chemical Corps draftsmen and forwarded to the New York Chemical Procurement District for procurement purposes in late August 1954. The drawings prepared were very similar to and/or copied from the drawings Padbloc had furnished Chemical Corps on June 9, 1954. In August or September 1954 the Chemical Corps sent these Chemical Corps drawings to fire bomb prime contractors who reproduced the drawings. Chemical Corps at that time also sent contractors information received from Padbloc concerning a composition for holding the fire bomb sealing gasket, and information concerning the specifications of blocking fiber. As of this time, no fire bombs or fire bomb packages had been delivered to the defendant under any of the pertinent procurement contracts. The defendant has stipulated that one or more fire bomb packages, substantially of the type shown on Chemical Corps drawing D14-17-658, as revised August 25, 1954, was produced for the Government. The total number of such packages produced for the Government has not yet been proved.
24. On October 5, 1954, the New York Chemical Procurement District advised Padbloc by a letter signed by Gersh-berg that Diamond Building Products Corporation had recently been released for the production of packaged fire bombs, and that it had been decided that the best interests of the Government no longer dictated the direct purchase of Padbloc containers. On October 20, 1954, Padbloc telegraphed the New York Chemical Procurement District that Padbloc acknowledged that a Chemical Corps letter dated October 14, 1954, “states that the Padbloc container 12001 is no longer considered as an alternate to the so-called new *396 Chemical Corps package”. The telegram also notified the Chemical Corps that “the written agreement date, May 28, 1964, between Chemical Corps and Padbloc Company, Inc., is no longer in effect.” On October 30, 1954, Padbloc wrote to the Chief Chemical Officer as follows:
This letter will confirm our wire of October 20, 1954, directed to Lt. Col. Hurley of the New York Chemical Procurement District, 180 Varick Street, New York, New York.
You are notified that by reason of the acts of Chemical Corps, TJ.S. Army, during the period from on or about July 15,1954, to date, the Government is not entitled to any royalty free license from Padbloc Company, Inc., as provided by the written agreement between Padbloc Company, Inc., and Chemical Corps, U.S. Army, dated May 28, 1954; nor is the Government entitled to act as if it had such a license with respect to new procurement after November 1, 1954.
PATENT INERIN6EMENT CLAIM
25. Plaintiff also seeks to recover reasonable and entire compensation under Title 28 TJ.S.C. § 1498, for alleged unauthorized use or manufacture by or for the United States of equipment described and claimed in the following United States Letters Patent relating to packages and clamps, and issued to Harry G. Lankford:

26. Defendant contends that plaintiff, The Padbloc Co. Inc., is not the owner of said Lankford patents. On May 19, 1952, Harry G. Lankford executed and delivered to The Pad-bloc Company, Inc., in Wichita, Kansas, an instrument which states—
ASSIGNMENT
KNOW ALL MEN BY THESE PRESENTS: That the undersigned, Harry G. Lankford, does on this 19th day of May, 1952 hereby assign, transfer, and convey *397 unto the Padbloc Company, Inc. all right, title, and interest which Harry G. Lankford has in any invention (patentable or otherwise), patents or rights to be derived from applications for patents pending (in which Harry G. Lankford appears as inventor) pertaining to packaging means, and all right, title, and interest which will accrue to Harry G. Lankford in the future while he is in the employ of Padbloc Company, Inc. in inventions (patentable or otherwise), patents or rights to be derived from applications for patents pending (in which Harry G. Lankford may appear as inventor) pertaining to packaging means.
Executed at Wichita, Kansas, on this 19th day of May, 1952.
No other instruments purporting to transfer ownership of the Lankford patents were offered in evidence. Lankford has been president of the plaintiff corporation at all times. The clamp disclosed and claimed in the ’117 patent has utility in the packaging of fire bombs in the packages disclosed and claimed in the ’096 and ’746 patents. Use of a clamp to secure bomb case members together, instead of the projecting studs 24 and 28 illustrated in Fig. 3 of the ’096 patent, appendix C, eliminates the need for holes 23 and 27 in the fiber blocking members 20 and 25 of the package illustrated. The ’117 patent specification does not mention packaging or packaging means.
27. The ’096 patent discloses a package including a cover, disassembled fire bomb case parts, and a plurality of spaced fiberboard members, supporting the fire bomb case parts within the cover in nested and spaced relationship. Figs. 1, 2, and 3 of the ’096 patent drawings are reproduced at the end of these findings as appendix C.
28. The ’746 patent discloses a package for a disassembled article having conoidal end members and a hollow center member, the package comprising a box including a slatted open bottom, side and end panels extending outside of the bottom and top panel overhanging the side and end panels, and having members mounted in the box. Figs. 1,2,3, and 6 of the ’746 patent drawings are reproduced as appendix D.
29. The ’117 patent discloses a clamp for joining together end to end hollow bomb case members, the clamp including end portions to overlap raised, beveled portions of the bomb *398 case members, a bolt to draw the end portions into sliding contact with the raised portions, and a spring tending to position and maintain the clamp out of clamping engagement. Figs. 1, 2, 3, and 6 of the ’117 patent are reproduced as appendix E.
30. Referring to the ’096 drawings, appendix C, the reference numeral 15 indicates the outer cover of the package. The cover is of wood construction and is closed and fastened by wire bands 16. The disassembled metal fire bomb case is comprised of center cylinder 17, and cone-shaped end elements 18 and 19. Fiberboard member 20 is provided with grooves 21 and 22 which extend partially therethrough and snugly receive and engage the lip of center cylinder 17 at one end and the lip of end element 18 at the base thereof, respectively. Holes 23 are spaced around the bottom of groove 21 to receive studs 24 on center cylinder 17. Fiberboard member 25 is provided with groove 26 which extends partially therethrough and is adapted to snugly receive and engage the lip of cylinder 17 at the other end, holes 27 being spaced along the bottom of groove 26 so as to receive studs 28 on center cylinder 17. Fiberboard member 25 is further provided with recess 29 which extends partially through member 25 and is adapted to snugly receive and engage the apex end of bomb element 19. Hole 30 in fiberboard member 25 is centrally positioned in recess 29 so as to receive nipple 31 on element 19. End element 18 of the bomb is provided with fiberboard washer 32 and with fiberboard discs 33 which cooperate with the lip at the base, and with the inside of element 19, respectively, such that when element 18 is inserted into element 19, the overall length of the unit thus formed is substantially equal to the length of cylinder 17. The fuse 34 of the bomb projects through an aperture in the middle of disc member 33. The various fiberboard members utilized in this package preferably have a pH in the range of 6.5 to 7.5 so as to prevent corrosion of the metal bomb elements at points of contact with the fiberboard members.
31. Claims 5 and 6 of the ’096 patent are relied upon by plaintiff. Claim 5 is reproduced below with indentation and emphasis added to facilitate identity and understanding of the structures sought to be covered by this patent.

*399
Olaim 5 of '‘096 patent

A package, which comprises, in combination, outer cover means,
a disassembled fire-bomb case comprising hollow conoidal end members and
a hollow center member nested within and spaced from said cover means with an apex end portion of one of said end members projecting into one other of said bomb case members,
a first end fiberboard member at one end portion of said cover means between the end thereof and said disassembled fire-bomb case members and in contact therewith, and
a second end fiberboard member in the other end portion of said cover means between the end thereof and said disassembled fire-bomb case members and in contact therewith,
said end fiberboard members having mowntmg means therein and end portions of said bomb case members mounted in their respective end fiberboard member mounting means,
and inner fiberboard means between and in contact with said apex end portion of said one of said end members and said other member into which it projects,
said inner fiberboard means having an aperture therethrough and said apex end portion mounted in said aperture,
and said fire-bomb case members spaced from each other in said package.
32. Claim 6 of the ’096 patent is similar to claim 5 in reciting the same combination of structural elements, but claim 6 recites disassembled outer housing members rather than a disassembled fire bomb case, omits the recital of fiberboard for the first and second end members and the inner means and adds that said members and means have portions which support, space and pad the housing members. Claim 6 is not limited to fire bomb case and not limited to fiberboard members.
33. Defendant has contended that the ’096 patent is invalid on the theory that Lankford deri/oed the subject matter thereof from a prior Beech Aircraft Corporation package or *400 from the work of one Herbert F. Austin. Prior to his development of the ’096 patent package, Lankford saw at the Beech plant in Wichita a Beech fire bomb package having the nose and tail bomb sections nested above the center bomb section on padded wooden blocking members, as illustrated in the drawing reproduced at the end of these findings as appendix F. Lankford was also familiar with work done in space in Lankford’s Wichita plant by Austin, who was experimenting with the chemical rigidification of fiberboards such as Celotex. Austin’s work resulted in U.S. patent 2,716,617, naming Austin as a co-inventor and relating to rigidified fibrous articles. The Austin, et al. patent application was filed February 7, 1951, and mentions that untreated Celotex is unsuitable for building, packaging, and other applications. Austin’s testimony in the present case contains no claim that he developed the package shown in the ’096 Lankford patent.
34. Defendant has referred to some 18 patents and five packages all prior in date to the December 5,1951, filing date of the ’096 patent. All of these items are alleged to have disclosed structural features described and claimed in the ’096 patent. Many of these items are cumulative and will not be discussed in these findings.
35. Dean patent 2,648,454, defendant’s exhibit 118, resulting from an application for patent filed September 17,1948, disclosed a shipping crate for disassembled streamlined auxiliary fuel tanks similar to a fire bomb case. Figs. 6 and 7 of the Dean patent drawings are reproduced as appendix G. The hollow conoidal end members 10 and 14 of the Dean patent fuel tanks were illustrated nested one within the other, and nested in the central tank members 11,12, and 13.
36. An Army-Navy general specification for packaging and packing for overseas shipment, defendant’s exhibit 114, issued February 15,1943, disclosed a plywood sheathed crate having exterior cleats. The specification mentioned the use of various cushioning materials including indented chipboard treated to be water resistant.
37. Lamb patent 2,392,675, defendant’s exhibit 116, issued January 8, 1946, disclosed a shipping container for projectiles, shells, and similar streamlined articles. The Lamb *401 patent disclosed the use of a spacer member which Closely fits the interior of the box and rests on the bottom thereof, and disclosed a filler member superimposed on the spacer member and having counterboard space provided in one face of the filler member to accommodate the end of the shell body. The Lamb patent also disclosed the use of upper spacer members for holding the upper ends of the projectiles in proper relation and having openings formed to closely fit the upper conoidal end portion of the projectiles.
38. A joint Army-Navy specification JAN-P-104, dated December 13,1945, defendant’s exhibit 115, related to packaging and packing for overseas shipment crates, sheathed, wood, nailed. Page 10 of this specification provided that sheathing on the sides and ends of crates should extend to the bottom of the sills. Page 32 of this specification disclosed in Fig. 2 a skid base having the floor members spaced “to provide drainage and ventilation.” Pages 54-56 of this specification disclosed nailing patterns in Figs. 27, 29, and 30. Page 60 of the specification disclosed in Fig. 34 a crate having the top panel extend over the top edges of the side and end panels.
39. Shelton patent 712,100, issued in 1902, disclosed a packing box having vertical and transverse cleats, and adapted to contain a plurality of bowl-like articles nested, one projecting into another. The articles were supported in spaced relation by a series of strawboard plates and aper-tured frames. Figs. 1 and 2 of the Shelton patent drawings are reproduced as appendix H.
,40. Bohnke patent 2,321,063, issued in 1943, cited by the Patent Office examiner against the ’096 patent application, disclosed a lightweight packing box for water heaters. The Bohnke box included a rectangular filler block formed of a number of layers of corrugated paperboard, and provided with a circular recess therein to receive and space the bottom of a water heater from the sides of the box. A similar paperboard blocking member with a cut recess was provided within the other end of the box. Figs. 1 and 5 of the Bohnke patent are reproduced in appendix H.
41. Defendant has contended that the plaintiff is estopped by reason of statements made in the file wrapper of the ’096 *402 application and in tbe file wrapper of patent No. 2,732,936 to assert that claims 5 and 6 of tbe ’096 patent cover tbe in-line resting arrangement of bomb parts wbicb represents the changed Government structure.
42. Defendant has contended that claim 5 of tbe ’096 patent is invalid over a fire bomb crate made by The Glenn L. Martin Company in 1950, a crate made by Simpers in 1950, a fire bomb package constructed by Fletcher Aviation Corporation in June 1951, or the crates made by the Beech Aircraft Corporation prior to 1951, each in view of the disclosures of the Shelton patent, finding 39, or the Bohnke patent, finding 40.
43. The Martin crate illustrated in defendant’s exhibits 66F and 66G, tested in July 1950, contained two disassembled fire bomb cases positioned between wood panels in a closed crate. A soft cushioning material was provided between the nested members of each case.
44. The Simpers crate, illustrated in defendant’s exhibits 66H and 85, tested by the Chemical Corps in July 1950, was similar to the Martin crate, but was open. The bomb case members were held on rubber cushions on wooden saddles by metal strapping, and were separated by creped cellulose wadding.
45. The Fletcher fire bomb package, described in defendant’s exhibits 35, 36, and 37, tested in early 1951, contained case members for two fire bombs disassembled and nested in a cleated wooden box. The case members were cushioned in the box with cellulose wadding and the nested members were separated from each other by spaced strips of cork tape. The Fletcher package also contained a fiberboard carton for the tie rods utilized in the assembly of the fire bomb case members.
46. The Beech package, seen by Lankford prior to the development of the package described in the ’096 patent and illustrated in appendix F, did not have the end fiberboard members and did not have the inner fiberboard means recited in claim 5 of the ’096 patent.
47. As briefly mentioned in finding 28, the ’746 patent relates to a package for a disassembled article, the package having an open bottom and having overhanging panels. The *403 application for the 5746 patent was filed February 19, 1954. Referring to the selection of ’746 patent drawings reproduced in appendix D, the reference numerals 11 and 13 in Fig. 1 indicate the two conoidal end members and the hollow cylindrical center member of a disassembled metal fire bomb case. The ’746 package is described in the patent specification as follows:
The new box means of my invention has a wooden slatted and raised bottom comprising bottom members 17 mounted on base members 19. This is a preferred bottom structure, giving good ventilation of the box by air passage up through the slatted bottom members and allowing for easy insertion of the forks of a forklift truck under members 17 on either side of center base member 19 to lift the box and its contents. The box of my invention has like wooden end panel members 21 with cleats 23 secured thereto. It is preferred to make the panel of end panel member 21 of plywood and cleat members 23 of dimension lumber, such cleat members strengthening the box and providing means by which to easily secure the box together. The box of my invention has like wooden side panel members having a plywood panel 25 with outer transverse cleats 27 and an upper longitudinal cleat 29 secured thereto. These cleat members 27 and 29 give support to the box and provide means to easily secure together the members of the box. The wooden top panel member of the box has a plywood panel 31 with transverse cleats 33 secured thereto on the outer surface thereof. These cleat members 33 likewise strengthen the box and provide means for securing together the box members.
The slatted bottom of the box has transverse cleat members 35 secured to the upper side of bottom members 17 in the end portions thereof. The side panel members have cleat members 37 transversely secured to the inside and in the end portions thereof. The top panel member has cleat members 39 transversely secured to the inside and in the end portions thereof. These cleat members 35, 37 and 39 support fiberboard packing members 41, inner packing members 41 in turn supporting, spacing and padding the apex end portions of conoidal end members 11 and the end portions of center member 13. These cleat members 35, 37 and 39 are positioned on the bottom, sides and top of the box, respectively, so that the inner edges of the cleat members are flush with each other, thus contacting and supporting packing *404 members 41 all around tbeir outer edges on the inside thereof.
The disassembled fire-bomb case is spaced from the bottom, ends, sides and top of the box and its members from each other by inner and end supporting, spacing and padding packing members 41 and 43. The end fiberboard packing members 43 have annular recesses 45 and 47 therein which receive the base end portions of conoidal end members 11 to mount same m the box. Inner packing members 41 have apertures 49 with their outer edges having substantially the same contour as the surfaces of the apex end portions of the conoidal end members 11, and members 41 receive in such apertures these apex end portions to mount the conoidal end members 11. A ring of spaced holes 51 receives and mounts bolts 15 and in turn cylindrical center member 13 between members 41 and spaced from the top, sides and bottom of the box. For articles whose conoidal end members are joined to the center member by means other than by bolts 15, such as by a centrally located longitudinal rod, holes 51 in members 41 can be replaced by an annular recess corresponding to the ends of the hollow center member.
$ ‡ ‡ $
* * * The bottom, one end and one side panel member can be nailed together with the lower portion of member 25 nailed to the outer edge of the outer member 17, and with the lower portion of member 21 nailed to the ends of members 17. The disassembled fire-bomb case members and packing members can then be inserted, followed by the other end panel member, the other side panel member and the top. I find it desirable to nail the top end cleats 33 to top cleat members 23 on the end members 21 and top panel 31 to cleats 29, and to nail through end cleat members 27 on side members 25 into side cleat members 23 on the end members 21. Metal straps 53 are then preferably placed around the box to better secure the members of the box.
48. Claims 1 and 3 of the ’746 patent are relied upon by plaintiff. Claim 1 is reproduced below with indentation and emphasis added.

Claim 1 of patent

A package for a disassembled article comprising conoidal end members and a hollow center member,
which comprises in combination:
*405 a box having a slatted bottom,
side pa/nel members extending the length of said box and disposed on the outside of said bottom, said bottom and side panel members positioned to form openings for ventilation of said box,
end panel members disposed on the outside of said bottom and a
top panel member extending the length of said box and overhanging said side panel members;
an end packing member in each end portion of said box having mownting means therewith and said conoidal end members mounted therein with each one of said mounting means having a base end portion of one of said conoidal end members mounted therein;
a pair of inner packing members in said box, said packing members having apertures therethrough and other mownting means therein and said co-noidal end members mounted therein with each one of said apertures having an apex end portion of one of said conoidal end members mounted therein and said hollow center member mounted in said inner packing members with each one of said other mounting means having an end portion of said center member mounted therein;
cleats secured to the inner sides of each of said bottom, side and top panel members in each end portion thereof, said cleat means in contact with and supporting said inner packing members on the sides thereof toward said end members of said box;
and other cleat means and strap means securing together said bottom, side, end and top panel members of said box.
49. Claim 3 of the ’746 patent is similar to claim 1 in reciting the same combination of structural elements, but claim 3 additionally recites that the box has a plurality of spaced base members, bottom members secured to the base members in spaced relation to provide a raised and slatted bottom; recites that the mounting means in the end packing members and in the inner packing members are of size <md shape to receive the conoidal end members, and recites that the cleats contact the edge portions of the packing members to maintain said packing members in supporting and spacing *406 position. Claim 3 is not limited to strap means to secure the members of the package together.
50. Defendant has contended that the ’746 patent is invalid on the ground that the patent claims are vague, misleading, and inaccurate, on the ground that the patent claims merely recite an aggregation of old elements, and on the ground that the patent claims are not patentable over the Magic Chef Inc. fire bom'b package produced in 1952, but modified as disclosed in defendant’s general specifications for packaging issued in 1943.
51. Claims 1 and 3 of the ’746 patent recite a package comprising a combination of structural elements including a box having a bottom, side members, end members and a top member, end packing members, inner packing members, cleats, cleat means and strap means (claim 1).
52. The evidence indicates that Magic Chef, Inc., delivered substantial quantities of packaged fire bombs to the defendant as early as June 1952, packed pursuant to Magic Chef drawings dated March 1952, defendant’s exhibits 1, 2, and 3. These drawings refer to Padbloc blocking parts or to Padbloc drawings, and show a package similar to the Padbloc No. 300 fire bomb package. A drawing illustrating the Padbloc No. 300 package is reproduced at the end of these findings as appendix I to illustrate the type of package produced by Magic Chef in 1952. As shown in the illustration, fiberboard end packing members were used in each end portion of the package and fiberboard inner packing members were used between the parts of the disassembled fire bomb case. The Magic Chef package utilized cleats and strap means to secure together the bottom, side, end and top panels of the package.
53. As briefly mentioned in finding 29, the ’117 patent relates to a clamp for joining together end to end hollow bomb case members. The application for the ’117 patent was filed July 6, 1954. Referring to the selection of ’117 patent drawings reproduced in appendix E, the reference numeral 24 in Figs. 2 and 3 indicates the clamp body. Six clamps circumferentially spaced are used to clamp the hollow nose section 8 to the hollow center section 12, and six clamps are used to clamp the center section 12 to the hollow tail section 10 of the fire bomb case illustrated in Fig. 1. *407 The nose section 8 and tail section 10 have a seal ring 18 welded thereto. The center section 12 has a seal ring 20 welded thereto on each end thereof. The clamp bodies are mounted on seal rings 18 and are operable to be adjusted into open or clamping position by 'bolts 22 recessed in holes in rings 18. The winged clamp bodies 24 with their projecting end portions in clamping position overlap the circumferential raised portions 26 and 28 of seal rings 18 and 20 respectively. Fig. 3 shows the clamp body in extended or open position, so that sections 8 and 10 can be mounted in proper position on section 12 of the bomb case for closing the clamp means, and so that section 12 can be fitted under its arm of the clamp bodies 24. Bolts 22 extend through corresponding holes in the raised portion 26 of the seal ring 18, and leaf spring 32, and clamp bodies 24 are threadedly mounted thereon so that turning the bolt closes or opens the clamp, as desired. The holes in seal rings 18 are such that the head of the bolt 22 is recessed, and a seal washer 30 is provided. Leaf spring 32 is used to urge the clamp bodies 24 out of clamping position and to aline the clamp bodies in proper position to receive raised portions 28 of seal ring 20. The leaf spring 32 has a portion 34 which fits against the adjacent projecting end portion or wing of clamp body 24 and prevents the body member from turning around the longitudinal axis of bolt 22 when the bolt is turned so that the clamp means will be extended or retracted upon turning of bolt 22. Springs 32 have projecting end portions 36 which overlap raised portions 26 of seal rings 18 to maintain the spring longitudinal to the raised portion 26 and in turn to maintain the clamp bodies 24 transverse to raised portions 26 and in position to receive member 12. Leaf spring 32 is in slidable engagement with raised portion 26. A common deformable O-ring 37 in a groove in portion 28 of member 20 seals the bomb case at the juncture of portions 26 and 28 of members 18 and 20, respectively. The clamp means are mounted on sections 8 and 10 during manufacture and remain there during shipping and storing. At assembly the bolts are loosened to open the clamps. Then sections 8 and 10 are mounted on section 12 in joined position. Tightening the several bolts 22 closes the several clamps to rigidly *408 connect tbe bomb case members together. In the modification illustrated in Fig. 6, appendix E, the raised portion 38 has a longitudinal groove 50 to receive the end portions 52 of the leaf spring 46.
54. Claims 1, 2 and 3 of the ’117 patent are relied upon by plaintiff. Claim 1 is reproduced below with indentation and emphasis added.

Olaim 1 of ’117 patent

Olamp means for joining together end to end hollow,
aerial bomb case members, comprising, in combination, circumferential raised portions around the inside of the end portions of said case members to be joined,
one of said raised portions having a longitudinal groove therein and a plurality of spaced holes there-through and
the other of said raised portions having a plurality of notches coinciding with said holes and adapted to receive a bolt,
a clrnvP' body_ adapted to be disposed longitudinal to and inside said case members, said clamp body having
projecting end portions adapted to overlap said raised portions to hold said case members together and having
a threaded hole,
bolt means adapted to pass through one of said holes in said raised portion and into said threaded hole in said clamp body to threadedly and adjustably mount same, and
leaf spring means slidably mountable on said last-named raised portion, said spring means having
end portions projecting therefrom to extend into said groove in said raised portion and a recessed middle portion with a hole therethrough to receive said bolt means and said middle portion adapted to receive and cradle said clamp body, said spring means_ adapted to urge said clamp body out of clamping position and to maintain said clamp body longitudinal to said case members, and said clamp means adapted to hold together said case members when same are positioned together with said bolt means in one of said notches m said raised portion and said bolt means is tightened.
*409 55. Claim 2 of the ’117 patent recites a combination of structural elements like those recited in claim 1 set out aboye, and adds that the circumferential raised portions are beveled on the inner sides and have abutting and overlapping portions on outer sides, that one raised portion has a recess to receive a deformable sealing member, that the projecting end portions of the clamping bodies have the inner faces beveled, and adds a recital of a deformable sealing member. Claim 2 does not limit the spring means to leaf springs, and does not recite the longitudinal groove in the raised portions nor the end portions of the spring projecting into said groove. Claim 8 of the ’117 patent is similar to claim 2 but defines the spring means as including leaf springs slidably mounted and having end portions to overlap the circumferential raised portions. Claim 2 and claim 3 do not contain the claim 1 recital of a plurality of notches in one of the circumferential raised portions. The notches recited in claim 1 are illustrated at 56 in Fig. 6 of the ’117 patent drawings.
56. Defendant has contended that the ’117 patent is invalid over prior art including—
Chemical Corps Clamp Assembly_1953
Beech Aircraft Corp. Clamp_1952
Morgan patent 180,781_1876
Northrop patent 2,390,730_1945
Bauer patent 437,276_1890
Taylor patent 1,433,430_1922
Manoogian patent 2,643,901_1953
57. Defendant also has contended that the ’117 patent is invalid on the ground of misleading prosecution in the United States Patent Office, and has contended that claims 1 and 3 of the ’117 patent have not been infringed by the defendant.
58. The Chemical Corps clamp assembly for connecting fire bomb sections is shown on drawing SK-A 1084, dated May 18, 1953, defendant’s exhibit 60. Said assembly was generally similar to the clamp assembly shown in Fig. 3 of ’117 patent drawings, appendix E, but did not include the spring means 32 of the ’117 patent between the clamp body and the circumferential raised portion. The Chemical Corps clamp assembly provided a cotter pin through the inner end portion of the clamp bolt to keep the clamp body from *410 separating from the bolt when the bomb case members are disassembled. One end portion of the Chemical Corps clamp body was longer than the other to loosely engage the raised portion of the case member when not in the clamping position. The left end portion of the clamp body 24 in Fig. 3 of the ’117 patent drawings is also shown longer than the right end portion even though the ’117 patent construction provides a leaf spring 32 having a middle portion 34 to prevent the body member from turning on the bolt 22. Lankford saw a clamp assembly of the Chemical Corps type prior to the time he began developing the ’117 patent type clamp assembly.
59. The Beech Aircraft Corporation, Wichita, Kansas, developed a clamp assembly for wing tank sections, as shown in drawings dated in 1950, defendant’s exhibits 70-73. The 1950 Beech wing tank clamp was an antecedent of the 1953 Chemical Corps fire bomb clamp assembly, and also had one end portion of the clamp body longer than the other, but the Beech clamp had no spring means. Beech Aircraft Corporation shipped to the defendant in 1952, under a contract with the Air Force, 30 wing tanks having clamp assemblies.
60. The early Morgan patent 180,781, defendant’s exhibit 67, disclosed a pipe coupling assembly including three cir-cumferentially spaced clamp bodies having beveled end portions to engage raised portions on the ends of the two pipes to be clamped together. The Morgan patent construction did not include any spring means on the clamping bolts.
61. The Northrop, et al. patent, 2,390,730, defendant’s exhibit 68, disclosed an airplane structure including a clamp assembly having beveled portions for clamping together complementary airfoil sections in compressional relation. The Northrop wedging clamp did not include spring means to keep the clamp body elements from turning.
62. The Bauer patent 437,276, defendant’s exhibit 44A, was cited by the patent examiner against the ’117 paten! application and disclosed a leaf spring for maintaining pressure on a ball and socket type connection or joint. The Bauer patent connection construction is not suitable for clamping bomb case sections together.
63. The Taylor patent, 1,433,430, defendant’s exhibit 132, *411 disclosed a lock for a grave vault closure, the construction of which is not suitable for clamping together fire bomb case members. The Taylor patent lock does not have any beveled surfaces for wedging parts together but does include a coil spring for holding the clamp body away from the vault cover prior to the clamping action produced by tightening a bolt extending through the coil spring.
64. The Manoogian patent, 2,643,901, resulting from an application for patent filed April 28,1949, disclosed connecting means for tubular sections such as sectional posts. The Manoogian patent was cited by the patent examiner against the ’ll! application for patent. The Manoogian patent, defendant’s exhibit 44E, taught the use of a plurality of circumferentially spaced clamp devices, each device having one end portion with a beveled edge for engagement with the beveled edge of a raised portion attached to the end of the adjacent tubular pipe section so that when a bolt through the device is tightened, the tubular sections are clamped together. The Manoogian patent construction also provides a single spring means passing through four spaced clamp devices to maintain the four clamps in alined position substantially parallel to each other prior to the clamping operation. During the prosecution of the ’117 application for patent counsel argued that the Manoogian clamp would not hold together members which can be held together by the ’117 clamp means since the Manoogian clamp would not work with raised portions around the inside of the end portions of bomb case members.
65. Claims 1 and 3 of the ’117 patent each recites means to join together hollow bomb case members and each includes detailed recitals of specific structure not found in the items listed in finding 58. Claim 1 recites a plurality of notches as mentioned in findings 56 and 57. Claims 1 and 3 recite that the leaf springs have end portions to extend into a groove or to overlap the circumferential raised portions. Such leaf spring end portions are illustrated at 36 in Fig. 3 and at 52 in Fig. 6 of the ’117 patent drawings, and engage the circumferential raised portions or a groove 50 therein to prevent the leaf spring and clamp from turning.
66. Claim 2 of the ’117 patent recites a combination of *412 structural elements identical with the combination illustrated on drawing SK-A 1084 of the Chemical Corps ring-lock assembly, defendant’s exhibit 60, with the exception that the claim 2 recital includes spring means. The spring means recited in claim 2 is defined as follows:
* * * separate spring means engageable with said raised portion having said spaced holes therethrough and said clamp body to urge said clamp bodies out of clamping position, said spring means having portions to receive said bolt means to maintain said sprmg means in position between said raised portion and said clamp bodies, ‡ ‡ •]■
67. The prior Taylor patent, noted in finding 63, disclosed separate springs 13 engageable with a portion of member 3, and with the clamp body 10 for urging the clamp body out of clamping position. The Taylor springs are coiled to receive the bolts 5 so as to maintain the springs in position between the member 3 and the clamp body 10. The prior Manoogian patent disclosed a spring 64 for engaging each of four clamp bodies 56 for urging the clamp bodies out of clamping position and away from the beveled flange 54 on the tubular member 34.
68. The accused clamp assembly used by the defendant is illustrated by an actual clamp, plaintiff’s physical exhibit 71, and sections of a fire bomb case, plaintiff’s physical exhibits 16A and 16B. Said clamp assembly does not utilize a plurality of notches in one of the raised portions as recited in claim 1 of the ’117 patent, nor does it use a spring having end portions to extend into a groove in one of the raised portions, also recited in claim 1. The accused clamp, plaintiff’s physical exhibit 71, utilizes a coil spring around the bolt, like that disclosed in the early Taylor patent, to urge the clamp body away from a case member. Said clamp assembly does not utilize separate leaf springs slidably mounted on a raised portion and having end portions projecting therefrom to overlap the raised portions, as recited in claim 3 of the ’117 patent.
CONCLUSION OK LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter *413 of law that plaintiff is entitled to recover on its contract claim and judgment is entered to that effect. The amount of recovery will be determined pursuant to Eule 38 (c).

 Lankford owned a majority of plaintiff’s shares and his wife the remainder.

 The number of such packages has not yet been shown since only the issue of liability has been tried.

 This court has occasionally suggested that state law applied, but in those cases the situations were distinguishable — e.g., federal law followed state law because general uniformity was not appropriate — or the statements in the opinions were inadvertent or unnecessary.

 See Corbin, Contracts, Secs. 62. (“Acceptance by Overt Act”) : 70 (“Oiler of a Promise, Requesting Non-Promissory Action in Return”) ; 71 (“Offer of an ‘Act’ for a Promise”) ; 77 (“Alternative Mofles of Acceptance”) ; Williston, Contracts, 3d ed., Secs. 22A (“Assent May Be Manifested by Acts”) : 31A (“Offers Generally Interpreted as Requesting Return Promises”) ; 78A (“Effect of Performance by Offeree as Acceptance of Offer to Bilateral Contract”) ; 90 (“Implication of Assent and Counter-Promise”).

 Of course, the absence of an express promise by the Government is not decisive. It has long been common, in proper cases, to find implied promises made or obligations assumed by tbe United States. See, e.g., United States v. Bostwick, 94 U.S. 53 (1876).

 See, also, Grosaman v. Schenker, 206 N.Y. 466, 100 N.E. 39, 40-41 (1912) ; Allegheny College v. National Chautauqua County Bank, 246, N.Y. 369, 159 N.E. 173, 176 (1927).
The decisions defendant cites all involved radically dissimilar circumstances in which the court found no implied promise. See Benedict v. Pincus, 191 N.Y. 377, 84 N.E. 284 (1908) ; Petterson v. Pattherg, 248 N.Y. 86, 161 N.E. 428 (1928) ; Crancer v. Lareau, 1 F. 2d 117 (C.A. 8, 1924) ; Sonino v. Magrini, 234 N.Y. Supp. 63 (App. Div., 1929) ; Cowan v. DeWitt, 129 N.Y. Supp. 2d 724 (Sup. Ct. 1954), aff’d 135, NY. Supp. 2d 379 (App. Div.).

 See Corbin, Contracts, chap. 8 (“Reliance on a Promise as Ground for Enforcement”) ; Williston, Contracts, 3ded., Sec. 140 (“Promissory Estoppel”) ; A.L.I., Restatement of Contracts, Sec. 90 (“Promise reasonably inducing definite and substantial action”) ; Sec. 45 (“Revocation of Offer for unilateral Contract; Effect of Part Performance or Tender”).